J-A07033-19

2019 PA Super 109

| | | |
|---|---|---|
| ROBERT HASSEL, BOTH INDIVIDUALLY AND IN HIS CAPACITY AS ADMINISTRATOR OF THE ESTATE OF MARY HASSEL, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 311 EDA 2018 |
| JOSEPH J. FRANZI, MD, PHD: FRANKFORD AVENUE FAMILY PRACTICE, P.C., D/B/A FRANKFORD AVENUE FAMILY PRACTICE WILLIAM V. ARNOLD, MD, PHD RECONSTRUCTIVE ORTHOPAEDIC ASSOCIATES, LL, P.C. D/B/A/ THE ROTHMAN INSTITUTE | : : : : : : : : : | |

Appeal from the Judgment Entered February 16, 2018
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  June Term, 2015   No. 2044

BEFORE:   OLSON, J., DUBOW, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:                    **FILED APRIL 08, 2019**

Appellant in this medical malpractice case Robert Hassel, both individually and in his capacity as administrator of the estate of Mary Hassel, deceased (hereinafter "Appellant") appeals from the judgment entered in the Court of Common Pleas of Philadelphia County on February 16, 2018, in favor of Appellees Joseph J. Franzi, M.D., Ph.D. and  Frankford Avenue Family Practice, P.C., D/B/A/ Frankford Avenue Family Practice (hereinafter "Dr. Franzi") and William V. Arnold, M.D., Ph.D. and Reconstructive Orthopaedic

_____

\* Former Justice specially assigned to the Superior Court.

Associates, II, P.C. D/B/A the Rothman Institute (hereinafter "Dr. Arnold")

(hereinafter collectively "Appellees"). Following a careful review, we affirm.

The trial court set forth the relevant facts and procedural history herein

as follows:

## I.     Procedural History

This appeal arises out of a medical malpractice jury trial, in which, at the conclusion of trial, the jury rendered a verdict in favor of [Appellees]. The jury found that Dr. Franzi was negligent, but that his negligence was not a factual cause of the harm visited upon the decedent Mary Hassel. The jury also found that Dr. Arnold was not negligent. [Appellant] now appeals the jury's verdict.

In this case, [Appellant's] negligence claim alleged that treatment rendered by Dr. Franzi, a family physician, and Dr. Arnold, an orthopedic surgeon, fell below the standard of care for the treatment and prevention of Deep Vein Thrombosis ("herein DVT") and Pulmonary Embolism. Specifically, [Appellant] alleged that Dr. Arnold failed to ensure that Mrs. Hassel was prescribed appropriate medication to prevent blot clots. Because of her risk factors for DVT, [Appellant] argued that Mrs. Hassel should have been prescribed an anticoagulant drug like coumadin, instead of aspirin, which is an antiplatelet drug. Dr. Franzi, her primary care physician, was accused of prescribing the wrong medication and failing to return voicemail messages from Mrs. Hassel's husband on the day she died, which [Appellant] alleged described symptoms of DVT that Dr. Franzi should have recognized. [Appellant] also contended that Mrs. Hassel's life could have been saved if Dr. Franzi would have returned her husband[']s phone calls on July 1, 2013.

On June 16, 2015, [Appellant] commenced this action by filing a Complaint against [Dr. Franzi] and [Dr. Arnold]. The Complaint brought professional negligence, wrongful death, survivor, loss of consortium, negligent infliction of emotional distress and vicarious liability claims against Dr. Franzi, Dr. Arnold and the other defendants. On June 26, 2015, [Appellant] filed certificates of merit in support of his claims. On December 1, 2017, an eight-day jury-trial commenced before the Honorable Kenneth J. Powell Jr to determine the remaining negligence,

wrongful death, survivor, and loss of consortium claims against Dr. Arnold and Dr. Franzi. Ultimately, the jury found that Dr. Franzi's treatment fell below the applicable standard of care, but that his negligence was not a factual cause of any harm to Mary Hassel and awarded no damages. Additionally, the jury found that Dr. Arnold's treatment did not fall below the applicable standard of care and no damages were awarded. On December 19, 2017, [Appellant] filed a timely post-trial motion, which was denied by this [c]ourt on January 8, 2018.

[Appellant] filed a timely appeal to the Superior Court on January 8, 2018, and this [c]ourt filed an order pursuant to Pa. R.A.P. 1925(b) requesting from [Appellant] a timely statement of errors. [Appellant] filed a timely statement of errors pursuant to Pa. R.A.P. 1925(b) on February 5, 2018.

## II.    Facts

On June 12, 2013, Mary Hassel, a 65-year-old woman, presented to Dr. Arnold, an orthopedic surgeon, with complaints of worsening left knee pain. N.T. December 6, 2017, p.m., pp. 13-15. Mrs. Hassel expected to discuss the possibility of knee replacement surgery. N.T. December 8, 2017, p.m., pp. 109. During this time, her mobility was limited and she was wheelchair bound. N.T. December 6, 2017, p.m., pp, 13-15. Mrs. Hassel's medical history showed a history of hypertension, osteoarthritis, thyroid disease, and a BMI of 41.6 at the time she sought treatment. N.T. December 8, 2017, p.m., pp. 78-80. Dr. Arnold ordered a STAT MRI and the results showed a fracture of Mrs. Hassel's femur. *Id*. at 95-97. He determined that surgery was not necessary and recommended immobilizing Mrs. Hassel's left leg to facilitate healing. *Id*. at 99. Dr. Arnold's plan was to replace her knee only after the femur healed. *Id*. at 109.

That same day, Dr. Arnold notified Mrs. Hassel of the MRI results by telephone and she opted to see Dr. Arnold again in 2 days as opposed to going immediately to the emergency room. *Id*. at 97-99. Blood clot prevention was discussed with Mrs. Hassel and coumadin was mentioned as an option. N.T. December 6, 2017, p.m., pp. 16. Mrs. Hassel was familiar with coumadin and understood that taking it requires additional diagnostic monitoring. *Id*. Dr. Arnold also told Mrs. Hassel that he would contact her primary care physician, Dr. Franzi, to discuss blood clot prevention treatment due to her being immobilized while the fracture heals. December 8, 2017, p.m., pp. 102. After speaking to Mrs. Hassel, Dr. Arnold contacted Dr. Franzi to discuss the

findings of the MRI and her potential risk factors for blood clots. *Id*. at 103. The two physicians agreed that Dr. Franzi would select the course of treatment for Mrs. Hassel based on his existing relationship with her and extensive knowledge about her medical history. *Id*. at 106-07. Dr. Arnold's notes from his conversation with Dr. Franzi demonstrated an understanding between the two of them that Dr. Franzi would work on Mrs. Hassel's "anticoagulation." N.T. December 6, 2017, p.m., pp. 82. Dr. Franzi contacted Mrs. Hassel that same day and advised her to take 325 milligrams of aspirin twice per day to prevent blood clots. Dr. Franzi discussed coumadin and aspirin as options to prevent blood clots but did not discuss other drugs. *Id*. at 92.

On June 14, 2013, Mrs. Hassel saw Dr. Arnold once again and he gave her the option of a cast or a brace to immobilize her leg. *Id*. at 57. Mrs. Hassel chose the brace and she was given a walker. *Id*. Dr. Arnold also asked Mrs. Hassel to attend physical therapy sessions, which she attended, and told her to follow up in two weeks. *Id*. Mrs. Hassel continued to work 40-42 hours a week, with help from Mr. Hassel, until July 1, 2013, the day before she died. *Id*. at 20. On the morning of July 1, 2013, Mr. Hassel picked her up from work after she completed a night shift. *Id*. at 23. Mrs. Hassel was not in any distress when she arrived home. *Id*. She napped for a few hours and was not feeling well when she woke up. *Id*. She was experiencing nausea, dry heaves, and diarrhea, *Id*. At 5:54 p.m. Mr. Hassel called Dr. Franzi's office to report her symptoms and left a message with a staff member. *Id*. at 26. He expected to be called back but wasn't. *Id*. Mrs. Hassel's symptoms persisted and worsened and Mr. Hassel placed another call to Dr. Franzi's office. *Id*. at 27. Once again, Mr. Hassel's call was not returned. *Id*. Hours later, Mrs. Hassel began to experience shortness of breath and Mr. Hassel placed a call to 911 at 1:42 a.m. *Id*. at 29. Paramedics arrived to transport Mrs. Hassel to the hospital and she died shortly thereafter. *Id*. at 33. Mrs. Hassel's cause of death was cardiac arrest caused by the DVT in her left leg and subsequent pulmonary embolism that developed. N.T. December 5, 2017, p.m., pp. 62-63.

[Appellant] presented expert testimony from Dr. David Diuguid, a hematologist, to provide causation opinions and support the contention that, anticoagulant drugs and antiplatelet drugs work differently, and he explained how each category of drugs affect blood coagulation. N.T. December 4, 2017, p.m., pp. 2-7, 39, 41, 45-50.[1] Dr. Diuguid alleged that anticoagulant drugs, as opposed to antiplatelet drugs, were more appropriate for Mrs. Hassel due to her risk factors for DVT that Dr. Franzi and Dr.

Arnold both knew about. *Id*. at 26, 59-62. He also testified that Mrs. Hassel likely would not have died, had she been placed on anticoagulant medication. *Id*. at 58. Dr. Diuguid also provided testimony to support Plaintiff's assertion that Mrs. Hassel's chances for survival would have improved if Dr. Franzi would have told her to go to the emergency room. *Id*. at 53-57,

[Appellant] also presented expert testimony from Dr. Paul Genecin, an expert in primary care medicine and family practice. N.T. December 5, 2017, a.m., pp. 10. Dr. Genecin testified that Dr. Franzi was aware of Mrs. Hassel's risk factors for DVTs as early as 2005 because her medical records show that he ordered multiple diagnostic tests to check for them. *Id*. at 21-27. He cites several instances where he felt that Dr. Franzi's treatment of Mrs. Hassel did not meet the standard of care, attacking his clinical record-keeping, choice of blood clot prevention medication, and the fact that Mr. Hassel's phone calls, describing her symptoms on the day she died, went unanswered. *Id*. at 30-31, 35-43, 45-52. Dr. Genecin concluded by stating that Mrs. Hassel could have been saved if Dr. Franzi would have returned Mr. Hassel's phone call and that his failure to do was a deviation from the standard of care. *Id*. at 52-53.

[Appellant's] third medical expert, Dr. Faust, an orthopedic surgeon, provided standard of care and causation opinions. Dr. Faust opined that Dr. Arnold's treatment of Mrs. Hassel did not meet the standard of care because orthopedic surgeons understand the risks of the development of DVT and he should have followed up with Dr. Franzi to ensure that Mrs. Hassel was on an appropriate medication to prevent blood clots. N.T. December 6, 2017, a.m., pp. 19-22, 40-41, 45-46. In Dr. Faust's opinion, aspirin was not an appropriate medication for Mrs. Hassel given her risk factors for DVT. *Id*. at 45-46.

[Appellant] presented an economist, David L. Hopkins to discuss Mrs. Hassel's economic productivity. N.T. December 7, 2017, p.m., pp. 4-49. Mr. Hassel also testified about his relationship with Mrs. Hassel and the events leading up to her death. N.T. December 6, 2017, p.m., pp. 5-58. Mrs. Hassel's daughter, Maureen Winscom testified about their relationship and her knowledge of the events that led to her death. N.T. December 6, 2017, a.m., pp. 108-128.

Dr. Franzi opined that offering aspirin for blood clot prevention to a patient with Mrs. Hassel's risk factors for DVT was an appropriate standard of care. N.T. December 6, 2017, p.m.,

pp. 104. Dr. Franzi also testified that the symptoms Mr. Hassel described in voicemails left at his office were not unique to a DVT diagnosis. *Id*. at 107-08. Dr. Franzi also discussed why he did not return Mr. Hassel's phone calls on June 1, 2013. Dr. Franzi's office was transitioning from paper charts to electronic medical records and the message was stored in an area that Dr. Franzi was not in the habit of checking, at the time. N.T. December 7, 2017, a.m., pp. 54-60. Dr. Franzi supported this theory of the case with expert testimony from Dr. Frankil, a cardiologist, offered as an expert on the standard of care for prevention and treatment of DVT and pulmonary embolism. N.T. December 7, 2017, p.m., pp. 85-89. Dr. Frankil also supported Dr. Franzi's contention that Mrs. Hassel's early symptoms, described in the voicemails, on the day she died would not have raised suspicion of DVT. *Id*. at 92-93, 99-100.

Additional support for Dr. Franzi's treatment of Mrs. Hassel was offered by Dr. Zakrzewski, a primary care medicine expert. Dr. Zakrzewski's testified about why aspirin was an appropriate medication for prevention of DVTs. N.T. December 8, 2017, p.m., pp. 22-28.

Dr. Franzi also offered Dr. Christensen, a pulmonary critical care specialist, as an expert in internal medicine, pulmonary medicine and the prevention and treatment of DVT's and pulmonary emboli. Dr. Christensen rejected the theory advanced by [Apppellant's] experts, that had Mrs. Hassel been put on an anticoagulant drug, she would not have developed a DVT. N.T. December 8, 2017, a.m., pp. 79-89.

Dr. Arnold's position was that he treated Mrs. Hassel expeditiously, corrected a misdiagnosis from a previous surgeon who treated her, and discussed blot clot prevention with Dr. Franzi, leaving the decision about what type of medication to prescribe with him as her primary care physician. N.T. December 8, 2017, p.m., pp. 127-128. Dr. Arnold's contentions were supported by Dr. Bosco, who was offered as an expert in orthopedic surgery, causation as it applies to orthopedic surgery, VTE prophylaxis for orthopedic surgeons and appropriate referral and deferral to other specialties for orthopedic surgeons. N.T. December 8, 2017, a.m., pp. 40-49,

___

[1] The transcript containing Dr. Diuguid's testimony contain[s] references to multiple trial dates. The cover sheet contains the date December 5, 2017. However, this is incorrect. Page 1 of Dr.

Diuguid's testimony shows that he testified on December 4, 2017. All references to Dr. Diuguid's testimony will use the date December 4, 2017 as indicated on page 1.

Trial Court Opinion, filed 6/25/18, at 1-7.

In his Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b), Appellant set forth eight (8) allegations of error, several of which contain numerous subparts. In his brief, Appellant presents the following seven (7) issues for our review:

1. Did the trial court err in permitting the improper use of learned treatises, *i.e.*, permitting the reading from, discussion of, and displaying to the jury, of the same?

2. Did the trial court err in permitting defense expert witnesses Dr. Frankil and Dr. Christensen to testify beyond the fair scopes of their reports?

3. Did the trial court err in permitting defendant Dr. Franzi and defense experts Dr. Frankil, Dr. Christensen, and Dr. Bosco, to testify on re-direct beyond the scope of their cross-examination?

4. Did the trial court err in permitting cumulative/duplicative expert testimony from defense experts?

5. Did the trial court err in not allowing Appellant's/Plaintiff's counsel's cross-examination of defendant Dr. Franzi regarding his involvement in prior lawsuits?

6. Did the trial court err in not allowing Appellant's/Plaintiff's counsel's cross-examination of defense expert Dr. Zakrzewski regarding his prior work as an expert witness for defense counsel and defense counsel's involvement in Dr. Zakrzewski's prior lawsuits?

7. Did the trial court err in not permitting Appellant's/Plaintiff's counsel's cross-examination of Dr. Franzi regarding his responses to requests for admissions?

Brief for Appellant at 4-5.

In considering Appellant's first claim, we are mindful that courts of this Commonwealth allow an expert witness the limited use of textual material on direct examination to explain the basis for that expert's reasoning. *Aldridge v. Edmunds*, 561 Pa. 323, 750 A.2d 292 (2000). On cross-examination, an expert witness may be questioned on the contents of any publication on which he or she relied in forming an opinion, or one in the field that he or she considers generally reliable; the evidence is admissible to challenge the witness's credibility, but the writing cannot be admitted for the truth of the matter asserted. *Majdic v. Cincinatti Mach. Co.*, 537 A.2d 334, 339 (Pa.Super. 1988), *appeal denied*, 520 Pa. 594, 552 A.2d 249 (1988). Excerpts from a publication which are read into evidence for the purpose of proving the truth of the statements contained therein constitute hearsay and, therefore, are inadmissible. This fact is not changed merely because the document is read into evidence by the witness instead of being received as an exhibit for inspection by the jury. It is the purpose for which the information is offered, not the manner in which is introduced, which makes it objectionable. *Id.* at 340.

In *Aldridge*, defense counsel examined an expert witness at trial through the use of textbooks on pediatrics. In its review of the use of those textbooks, the Pennsylvania Supreme Court clarified its position

on the use of learned treatises at trial generally. ***Aldridge***, 561 Pa. at 334, 750 A.2d at 298. The Court held that although some published materials could be considered hearsay, an expert witness may nonetheless rely upon them in the formation of his or her opinion, and it would be unreasonable to restrain an expert witness entirely from any use of a learned treatise. ***Id***. at 333-34, 750 A.2d at 297-98. However, the Supreme Court did direct that trial courts should exercise caution and issue limiting instructions when allowing the use of learned treatises to ensure that the publications themselves did not become the focus of the examination and supersede the expert's own testimony. ***Id***. Thus,

> [u]pon a party's request, the trial court shall issue appropriate limiting instructions to ensure that the inadmissible hearsay does not come in for substantive purposes and that the treatise does not become the focus of cross. ***Aldridge***, 750 A.2d at 297 (citing Pa.R.E. 105 ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon request shall, or on its own initiative may, restrict the evidence to its proper scope and instruct the jury accordingly.")). It remains to be determined, however, "whether the [a]ppellants are entitled to a new trial, as an erroneous evidentiary ruling will generally require reversal only if it caused prejudice." ***Aldridge***, 750 A.2d at 298 (holding that erroneous admission of hearsay did not prejudice results of trial so as to require reversal). A trial court's failure to limit the use of treatises effectively may constitute grounds for reversal only if the issue was properly preserved at all stages of the proceedings and prejudice can be established. ***See Klein***, 85 A.3d at 505 (Pa. Super. 2014) (Fitzgerald, J., concurring in part and dissenting in part) (citing ***Aldridge***, 750 A.2d at 298).

***Crespo v. Hughes***, 167 A.3d 168, 185–87 (Pa.Super. 2017), *appeal denied*, 184 A.3d 146 (Pa. 2018).

- 9 -

Before we reach the merits of this issue, we first must determine whether Appellant properly has preserved it for our review. Prior to its discussion of this claim in its Opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court stated:

Appellant makes a panoply of evidentiary arguments alleging that this [c]ourt, among other things, allowed learned treatises to be improperly used by [Appellees]. This [c]ourt welcomes the opportunity to thoroughly address all the issues Appellant raises on appeal. However, it must be initially noted that Appellant did not include a single reference to the trial record in his lengthy Statement of Errors or his Post-Trial Motion. Therefore, all allegations of error in this Opinion will be analyzed according to this [c]ourt's good faith effort to precisely capture the contours of trial testimony, and identify documents that Appellant should have referenced.

Trial Court Opinion, filed 6/25/18, at 13.

In his Concise Statement Appellant alleges, in relevant part:

**I. FIRST ARGUMENT: IMPROPER USE OF LEARNED TREATISES**

**a**. This Honorable Court erred by allowing defense counsel to utilize medical literature ("Learned Treatises") during **direct examination of their own defense experts**, including Dr. Frankil, Dr. Zakrzewski, and Dr. Christensen, **as well as on direct examination of Defendant Franzi**, to improperly bolster their experts' and defendant's opinions on direct examination (and re-direct examination) by discussing the specific content of the Learned Treatises, by reading directly from the Learned Treatises to the jury, and by marking it as an exhibit to show the jury on direct examination (and re-direct examination). See Aldridge v. Edmunds, 750 A.2d 292, 296 (Pa. 2000); see also Jones v. Constantino, 631 A.2d 1289 (Pa. Super 1993).

**b**. This Honorable Court erred by allowing defense counsel to publish (i.e. display the documents on a screen projected for the jury to see) multiple medical literature articles ("Learned

- 10 -

Treatises") during **cross-examination of Plaintiff's experts**, including Dr. Diuguid, Dr. Genecin, and Dr. Faust, as well as on **direct examination of Defendant Franzi** and **direct examination of defense experts**, including Dr. Frankil, Dr. Zakrzewski, and Dr. Christensen.

**c**. This Honorable Court erred by not allowing [Appellant] to utilize several pieces of medical literature ("Learned Treatises") during the **cross-examination of [Appellees]**, Dr. Franzi and Dr. Arnold, as well as during the **cross-examination of defense experts**, Dr. Frankil, Dr. Zakrzewski, Dr. Christensen, and Dr. Bosco, which had been properly authenticated by plaintiff experts, through the testimony of [Appellant's] experts, Dr. Diuguid and/or Dr. Genecin. See McDaniel v. Merck., Sharp & Dohme, 533 A.2d 436, 447 (Pa.Super. 1987); see also Judge Bernstein in Pennsylvania Rules of Evidence, 2015 Ed., at p. 831.

**d**. This Honorable Court erred by allowing defense counsel to improperly utilize medical literature ("Learned Treatises") during the **cross-examination of[Appellant's] experts**, including Dr, Diuguid, Dr. Genecin, and/or Dr. Faust, which were never properly authenticated during trial.

**e**. This Honorable Court erred by allowing defense counsel to utilize medical literature ("Learned Treatises") **during direct examination of defense experts and cross-examination of Plaintiff's experts**, including Dr. Diuguid, that had never been disclosed in discovery, expert reports, and/or the Pre –Trial Memorandum, in violation of this Honorable Court's Order, dated June 15, 2016, and/or the Pre -Trial Memoranda and Orders and/or the Rules of Evidence.

*See* Plaintiff's/Appellant's Concise Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b) at 1-2 (emphasis in original).

Following our independent review of the general allegations contained in Appellant's Concise Statement, we agree that it is unclear which of the "Learned Treatises" Appellant intended to challenge on appeal and the point during any of the numerous expert witness's direct or cross examination at

which he wished to challenge the same. Appellant further fails to identify in his Concise Statement where in the record these challenges were preserved for appeal, for he fails to state exactly where in the notes of testimony this Court can find objections thereto.

It is axiomatic that when a court has to guess what issues a defendant is appealing, that is not enough for meaningful review. Similarly, when a defendant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues. In other words, a concise statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no concise statement at all. **Commonwealth v. Butler**, 756 A.2d 55, 57 (Pa.Super. 2000), *affirmed*, 571 Pa. 441, 812 A.2d 631 (2002); **Lineberger v. Wyeth**, 894 A.2d 141, 148 (Pa.Super. 2006). In light of the foregoing, Appellant has waived this challenge for appellate review.

In addition, the trial court referenced an eight day trial in its rule 1925(a) Opinion. However, Appellant initially provided this Court with the notes of testimony from only the a.m. portion of December 4, 2017, and the a.m. and p.m. sessions of the notes of testimony for only December 5, 2017, December 6, 2017, December 7, 2017, and December 8, 2017. Our Prothonotary put forth extensive efforts to ascertain the remaining notes of testimony, which include the trial court's instruction to the jury and closing

arguments, and this Court did not receive the same until the eve of oral argument.[1]

Upon finally reviewing the notes of testimony from the p.m. session of the December 8, 2017, and those from December 11, 2017, along with the others, we were unable to ascertain a place where Appellant requested that the trial court provide the jury with a limiting instruction. Indeed, Appellant does not allege that he had made such a request. As a result, Appellant has waived his first issue on this basis as well. **See Crespo**, 167 A.3d at 187 (stating trial court's alleged failure to limit properly the use of learned treatises constitutes grounds for a new trial only where a party specifically objects to the impermissible reading medical literature and requests a specific limiting instruction pertaining to the jury's consideration of the literature).[2]

_____

[1] We remind Appellant it is his duty to ensure this Court receives all of the documents needed to review his issues on appeal. Pa.R.A.P.1921 (setting forth the composition of the record on appeal); **Commonwealth v. Reed**, 601 Pa. 257, 263, 971 A.2d 1216, 1219 (2009). "[A]n appellate court cannot consider anything which is not part of the record in the case ... because for purposes of appellate review, what is not of record does not exist." **Commonwealth v. Johnson**, 33 A.3d 122, 126 n. 6 (Pa.Super. 2011), *appeal denied,* 47 A.3d 845 (Pa. 2012) (citations and internal quotation marks omitted). "Where a review of an appellant's claim may not be made because of such a defect in the record, we may find the issue waived." **Eichman v. McKeon**, 824 A.2d 305, 316 (Pa.Super. 2003).

[2] Even had Appellant properly preserved this issue for our review, we would find that to the extent the trial court was able to address the same, it did so adequately and we would rely upon its well-reasoned analysis in disposing of Appellant's initial claim. **See** Trial Court Opinion, filed 6/25/18, at 13-26.

Appellant next maintains the trial court erred in permitting Drs. Frankil and Christensen to testify to matters which exceeded the fair scope of their expert reports. We disagree.

We review a trial court's evidentiary decisions for an abuse of discretion. *See Schmalz v. Mfrs. and Traders Trust Co.*, 67 A.3d 800, 802–03 (Pa. Super. 2013); *Smith v. Paoli Mem'l Hosp.*, 885 A.2d 1012, 1016 (Pa.Super. 2005) ("Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court.") (citations omitted). In this context, "[d]iscretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Schmalz, supra* at 803 (citation omitted). "To reverse the trial court, the [S]uperior [C]ourt must consider all the evidence in the light most favorable to the appellee and conclude that the verdict would be changed if another trial were granted." *Woodard v. Chatterjee*, 827 A.2d 433, 440 (Pa.Super. 2003) (citation omitted) (brackets in original).

Experts may testify at trial concerning matters which are within the fair scope of a pretrial report. The avoidance of unfair surprise to an adversary concerning the facts and substance of an expert's proposed testimony is the primary purpose of the rule requiring that testimony be within the fair scope of the pretrial report. *Walsh v. Kubiak*, 661 A.2d 416, 419-20 (Pa.Super.

- 14 -

1995) (*en banc*), *appeal denied*, 672 A.2d 309 (Pa. 1996) (citations and quotation marks omitted).

The fair scope rule is addressed in Pa.R.C.P. 4003.5(c) and provides that an expert witness may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of matters testified to in discovery proceedings or, as here, included in a separate report. In **Wilkes–Barre Iron & Wire Works, Inc. v. Pargas of Wilkes–Barre, Inc.,** 502 A.2d 210 (Pa.Super. 1985), this Court explained that:

> [I]t is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular facts and circumstances of each case. The controlling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary's request, "the substance of the facts and opinions to which the expert is expected to testify" is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. **See Augustine v. Delgado,** 332 Pa. Super. [194] at 199, 481 A.2d [319] at 321 [ (1984) ] ("Pa.R.Civ.P. 4003.5 favors liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise"); **Martin v. Johns– Manville Corp.,** 322 Pa. Super. [348] at 358, 469 A.2d [655] at 659 [ (1983) ] ("[W]e have found experts' reports to be adequate ... when the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness."). In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

**Id.** at 212–13.

In applying this controlling authority herein, we conclude the trial court committed no error of law and acted well within the proper scope of discretion in admitting the challenged testimony. In his brief, Appellant maintains he objected to defense expert Dr. Frankil's testimony regarding the placement of a filter to prevent a clot, which was offered in response to Appellant's expert testimony, on the basis that Dr. Frankil's report did not reference filters. Brief for Appellant at 33. However, a review of the record reveals Appellant's counsel did not set forth a specific objection in this regard:

> Mr. Aussprung: Your Honor, while he's doing that I don't believe that this report mentioned anything about filters.
> THE COURT: It was just—
> Mr. Wright: That was a response to the testimony that was given by your expert.
> THE COURT: I will overrule that.

N.T., 12/7/17 p.m., at 99.

Following this exchange, counsel did not further object on the basis that Dr. Frankil's testimony was not properly in response to that provided by Appellant's experts during trial. Therefore, this claim is waived. *See* Pa. R.A.P. 302(a); **Jones v. Ott**, ___ Pa. _____, 191 A.3d 782, 787 (2018) (stating "In order to preserve an issue for appellate review, a litigant must place a timely, specific objection on the record." (citations omitted)).

In addition, Appellant's assertions to the contrary, in the sixth paragraph of his expert report dated February 25, 2017, Dr. Frankil discussed Mrs. Hassel's fracture and her mobility issues; therefore, counsel's objection that Dr. Frankil's testimony concerning the fracture was not in his report and well

beyond the scope of cardiology and his position that he was not put on notice of such testimony, *see* Brief for Appellant at 33-34, is unsupported by the record.

Appellant further avers the trial court erred in overruling his objection to Dr. Christensen's testimony pertaining to whether aspirin was an appropriate treatment for Mrs. Hassel as exceeding the scope of his expert report. Brief for Appellant at 34. As the trial court notes in its Rule 1925(a) Opinion, in his February 23, 2017, expert report, Dr. Christensen opines as follows:

> I would submit that Dr. Franzi's decision to increase [Mrs. Hassel's] aspirin dose was an extrapolation of several of these guidelines and was actually above the standard of care offering VTE prophylaxis with little risk of bleeding.

Dr. Christensen's Expert Report, 2/23/17, at 6.

In light of the foregoing, Appellant's claims he was highly prejudiced as he had no notice of the aforementioned opinions and was unprepared to cross-examine the physicians regarding the same are belied by the record. To the contrary, our review of notes of testimony revealed that Appellant's counsel had ample opportunity to cross-examine Drs. Frankil and Christensen and conducted a capable and productive cross-examination of them. (*See* N.T. Trial, 12/7/17 p.m., at 105-116; 123-24; N.T. Trial, 12/8/17 a.m., at 69-72; 89-129; 140-146). For example, counsel questioned each doctor's assumptions and challenged his methodology. As such, viewing the evidence in the light most favorable to Appellant, as we must under our standard of

- 17 -

review, we conclude there is no support for the claim of surprise. The trial court committed no error of law and properly exercised its discretion in admitting the challenged testimony.

In his third allegation of error, Appellant states the trial court erred in permitting Dr. Franzi and his defense experts Dr. Frankil, Dr. Christensen, and Dr. Bosco to testify on re-direct examination to matters beyond the scope of their cross-examination. However, in the body of his appellate brief, Appellant develops a single-paragraph argument pertaining only to Dr. Frankil's testimony as to whether he agreed with the testimony of Appellant's hematology expert. Thus, Appellant has waived any argument concerning the other doctors' testimony. *See Commonwealth v. Roche*, 153 A.3d 1063, 1072 (Pa.Super. 2017), *appeal denied*, 641 Pa. 807, 169 A.3d 599 (2017) (reiterating waiver results if an appellant fails to develop properly an issue or cite to legal authority to support his contention in his appellate brief).

While Appellant now contends Dr. Frankil's opinion as to causation was beyond the scope of his expert report, Brief for Appellant at 35, the basis for his objection at trial was that Dr. Frankil had not been qualified during vior dire to testify as an expert regarding causation at trial. N.T., 12/6/17 p.m., at 90-91. The Pennsylvania Supreme Court has long held that to preserve for appellate review an objection, the objection must be specific and brought to the trial judge's attention as soon as is practical. *Commonwealth v.*

*Sanchez*, 623 Pa. 253, 297–98, 82 A.3d 943, 969–70 (2013); Pa.R.A.P. 302(a).

Here, Appellant did not lodge a specific objection that the proposed causation testimony exceeded the scope of Dr. Frankil's expert report at trial, and, instead, raised that basis for objection for the first time on appeal. Thus, it is waived. *Sanchez, supra*. In the alternative, as defense counsel noted, and as Appellant's counsel acknowledged, such testimony was in response to testimony that Appellant's expert had provided at trial. N.T. 12/7/17 p.m., at 96. Therefore, the trial court did not err in allowing it.

Appellant next argues the trial court erred in allowing Appellees to introduce "excessively duplicative" expert testimony despite its pretrial order entered November 29, 2017, in response to Dr. Arnold's Motion in Limine filed on November 15, 2017, precluding Appellant from offering cumulative testimony at trial. Appellant states that in reliance upon this directive, he did not ask his expert Dr. Diguid to opine as to standard of care. Appellant argues the direct testimony of Dr. Frankil, a general clinical cardiovascular specialist, was unnecessary as the instant matter did not involve cardiology issues and other defense experts testified as to standard of care. Appellant also states that this, along with proffered testimony of Thomas Zakrewski, an internist qualified to discuss primary care medicine, on the standard of care constituted excessively cumulative and severely prejudicial testimony.

"We begin by noting there is a subtle difference between evidence that is 'corroborative' and evidence that is 'cumulative.' In the most general sense, corroborative evidence is '[e]vidence that differs from but strengthens or confirms what other evidence shows,' while cumulative evidence is '[a]dditional evidence that supports a fact established by the existing evidence.' Black's Law Dictionary. 674, 675 (10th ed. 2014)."

*Commonwealth v. Small*, ___ Pa. ____, ____, 189 A.3d 961, 972 (2018). Upon review of the certified record, we conclude the trial court did not abuse its discretion in finding that the challenged testimony was corroborative rather than cumulative and, therefore, proper under the terms of its pre-trial orders because each of Dr. Franzi's experts opined form the perspective of his specialty. We reach this conclusion based on the trial court's sound reasoning, which we adopt as our own:

> Appellant opines that the testimony from the aforementioned experts was cumulative and that this [c]ourt applied its decision on a *Motion In Limine* dated November 29, 2017, unequally.[8] This [c]ourt also issued a pre-trial order, attached hereto as Exhibit A, asking the parties to review testimony prior to trial so that cumulative testimony can be eliminated.[9]
>
> Each of the experts Dr. Franzi presented, offered opinions from different specialties, and approached the standard of care issue from different clinical perspectives. Each of the experts reached the same conclusion, that aspirin was an appropriate treatment for Mrs. Hassel, and their testimony is consistent with what the Superior Court determined in *Klein v. Aronchick*[3] to be corroborative testimony, not cumulative testimony.

---

[3] *Klein v. Aronchick*, 85 A.3d 487 (Pa.Super. 2014), *appeal denied*, 104 A.3d 5 (Pa. 2014).

Appellant also argues that Dr. Diguid's testimony was unfairly limited by this [c]ourt and that it enforced pre-trial *Motion's In Limine* on the issue of cumulative testimony unfairly or unequally. Appellant's statement of errors does not provide any direction with regard to how this [c]ourt unfairly limited Dr. Diuguid within the context of Dr. Franzi or Dr. Arnold's testimony. However, the record indicates that this [c]ourt granted two *motions in limine* submitted by Defendant, William V. Arnold M.D. Ph.D.

The first *Motion In Limine* of Defendant William V. Arnold M.D. Ph.D., dated November 29, 2017, and referenced supra, to preclude Plaintiff from [o]ffering [c]umulative [t]estimony at [t]rial, contained the following language added by this Court.

> "Motion as to Cumulative Testimony is GRANTED, testimony of specific witnesses['] cumulative testimony is discussed in this Court's pretrial Order and should be resolved, if possible, according to that directive."

A discussion about cumulative testimony of the experts testifying, in this case, took place on the record prior to opening arguments. December 4, 2017, a.m., pp. 8-18. Counsel for Dr. Arnold expressed concern about [Appellant's] hematologist (Dr. Diuguid) and critical care doctor (Dr. Genecin) presenting testimony on the standard of care for an orthopedic surgeon. *Id*. at 8. This [c]ourt then asked each of the parties to draft a motion, which crystalizes their arguments on this issue. *Id*. at 13. The [c]ourt then issued an order on December 4, 2017, precluding "any and all fact and/or expert witnesses not board certified in orthopedic surgery from offering unqualified and cumulative standard of care and/or causation opinions as to defendant, William V. Arnold, M.D., Ph.D[10]".

The second discussion related to this issue occurred prior to the jury entering the room before the beginning of Dr. Frankil's testimony. N.T. December 7, 2017, p.m., pp. 59-62. Appellant objected to Dr. Frankil's testimony, on the grounds that it was cumulative and that he was not qualified to render an opinion against Dr. Franzi (a family physician) because he is a cardiologist. This court overruled Appellant's objection. The following excerpt from this discussion provides context as it relates to this issue.

> [Defense Counsel] We're looking at it. I take the same position I did in that motion. There's an overlap in the two specialties. He's permitted to testify.

[[Appellant's] Counsel] There's more of an overlap between hematology and the issues in this case than there are between cardiology issues in this case. I was not permitted to have my expert give those opinions.

[Defense Counsel] I did not object to the hematologist.

[[Appellant's] Counsel] We had a whole discussion, Ms. Hansen [Counsel for Dr. Arnold] and I, about the bounds of my opinion that he could not give a standard of care opinion. And that was the ruling.

[Defense Counsel] That's between orthopedics and hematology, not between hematology and internal medicine. I didn't raise that objection.

[The [c]ourt] So I allow it and I will rule on it as necessary. N.T. December 7, 2017, p.m., pp. 59-62.

It appears that Appellant was simply confused by the scope of the order, filed by this [c]ourt, which clearly precluded any expert who isn't board-certified in orthopedic surgery from testifying against Dr. Arnold. The Order did not weigh in on whether Dr. Diuguid, Appellant's hematology expert could offer standard of care opinions against Dr. Franzi. Therefore, any interpretation to the contrary that Appellant developed through the course of this litigation is purely subjective. That notwithstanding, Dr. Diuguid provided ample testimony calling into question Dr. Franzi's professional competence and unavailability on the day Mrs. Hassel died. With respect to Dr. Arnold, Appellant also elicited ample testimony from Dr. Faust, an orthopedic surgeon with the same board certification, to testify about the standard of care of an orthopedic surgeon. Dr. Faust challenged Dr. Amold's treatment of Mrs. Hassel in great detail. Dr. Diguid was not unfairly limited by this [c]ourt. This issue is meritless.

─────

[8] Motion in Limine of Defendant's, William V. Arnold, M.D., Ph.D. to preclude from Offering Cumulative Testimony at Trial, Control No. 17112117, filed Nov. 15, 2017 and decided by this [c]ourt on November 29, 2017.

[9] This document was submitted for docketing, but for unknown reasons it is not on the docket. Thus, it is attached so that the Superior Court has a full record for review.

[10]Defendant's William V. Arnold, M.D., Ph.D. and Reconstructive Orthopedic Associates II, P.C. d/b/a The Rothman Institute's motion *in limine* dated December 4, 2017 and docketed December 4, 2017.

Trial Court Opinion, filed 6/25/18, at 36-38.

Appellant's fifth and sixth issues pertain to the trial court's alleged error in failing to permit Appellant to cross-examine Dr. Franzi regarding his prior involvement in medical malpractice cases and to cross-examine defense expert Thomas Zakreski, M.D. regarding his relationship with Dr. Franzi's counsel. Appellant posits such questioning was relevant and in doing so relies upon this Court's decision in *Flenke v. Huntington*, 111 A.3d 1197, 1200 (Pa.Super. 2015) wherein this Court stated, *inter alia*, that the impeachment of expert witnesses by demonstrating their partiality is permitted under Pennsylvania law. Brief for Appellant at 40.

Generally speaking, evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence." Pa.R.E. 401(a). "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402. Although relevant, evidence may be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Moreover,

- 23 -

> [t]he scope of cross-examination is within the sound discretion of the trial court, and we will not reverse the trial court's exercise of discretion in absence of an abuse of that discretion. Generally, [e]very circumstance relating to the direct testimony of an adverse witness or relating to anything within his or her knowledge is a proper subject for cross-examination, including any matter which might qualify or diminish the impact of direct examination. Specifically regarding medical experts, the scope of cross-examination involving a medical expert includes reports or records which have not been admitted into evidence but which tend to refute that expert's assertion.

*Jacobs v. Chatwani*, 922 A.2d 950, 965 (Pa.Super. 2007) (citation omitted), *appeal denied*, 595 Pa. 708, 938 A.2d 1053 (2007).

Herein, aside from his brief citation to *Flenke*, Appellant's two-paragraph argument in support of his fifth issue contains a reference to Pa.R.E. 607(b)[4] and baldy concludes that "[g]iven the witness['s] prior involvement in medical malpractice litigation, his credibility and bias **may** be evident to the jury, which [it] **may** properly use to assess his credibility. Thus, this line of cross-examination was relevant and proper." Brief for appellant at 40 (emphasis added). Appellant maintains that the same analysis would apply to his sixth issue which challenges the trial court's preventing him from cross-

---

[4] Entitled "Who May Impeach a Witness, Evidence to Impeach a Witness," Pa.R.E. 607 reads in relevant part, as follows:

> **(b) Evidence to Impeach a Witness.** The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules.

Pa.R.E. 607(b).

examining Dr. Zakreski, and following a lengthy quote from **Flenke** he simply concludes:

> Such cross-examination was acceptable, and is also appropriate for this case, including motives and incentives given a prior history of writing reports and doing expert work for the same defense attorney and whether writing an unfavorable report would render him less likely to be used as an expert again for the defense attorney.

Brief for Appellant at 43.

In **Yacoub v. Lehigh Valley Med. Assocs., P.C.,** 805 A.2d 579, 592 (Pa.Super. 2002) (*en banc*), this Court acknowledged that "an expert witness can be cross-examined as to any facts that tend to show partiality on the part of the expert[.]" Nevertheless, Appellant herein utterly has failed to establish that any error with regard to these evidentiary rulings resulted in prejudice to him which would warrant a new trial. **See Yacoub**, 805 A.2d at 586 ("[I]f the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining party."). **See also Jacobs, supra**, at 966–67.  Appellant's arguments in this regard are in terms of generalities and hypotheticals; accordingly, [Appellant] has failed in his duty to persuade us that these purportedly erroneous evidentiary rulings resulted in prejudice so as to warrant a new trial.   **Jacobs**, at 967.

Finally, Appellant claims the trial court should have permitted cross-examination of Dr. Franzi pertaining to his verified responses to requests for

admissions. Relying on Pa.R.E. 611(b)[5] in the two short paragraphs he devotes to this issue in his appellate brief, Appellant concludes, "[c]ross-examination of the requests for admissions involving the femur fracture/pelvis are clearly relevant to the issues in this case and to Dr. Franzi's credibility, and preventing such examination was improper and prejudicial to [Appellant]." Brief for Appellant at 44. The referenced exchange proceeded as follows:

> Mr. Aussprung: Now, we had- the lawyers, we had a little bit of a dispute about something that came up in your deposition. Remember we were talking about the femur and I asked you about her fracture?
> Dr. Franzi: Yes, sir.
> Mr. Aussprung: And you said, well, it was more of a crack?
> Dr. Franzi: It was a nondisplaced fracture, which is a crack, yes, sir.
> Mr. Aussprung: You didn't like the term fracture. You wanted to use the term crack, correct? Can we agree it's a fracture?
> Dr. Franzi: Absolutely.
> Mr. Aussprung: And I said, well, the femur is the strongest bone in the human body, right?
> Dr. Franzi: Yes, sir.
> Mr. Aussprung: You said, well—
> Dr. Franzi: Well, actually you said it was the largest bone and I agreed with that.
> Mr. Aussprung: Then I said it's the strongest bone and you said, well, you weren't so sure?
> Dr. Franzi: I'm not.

---

[5] This Rule states, in relevant part, that "[a] party witness in a civil case may be cross-examined by an adverse party on any matter relevant to any issue in the case, including credibility, unless the court, in the interests of justice, limits the cross-examination with respect to matters not testified to on direct examination." Pa.R.E. 611(b).

Mr. Aussprung: And I said well what bone is stronger than the femur and you told me the pelvis, right?

Dr. Franzi: Yes, sir.

Mr. Aussprung: And the pelvis since then we all understand and agree that the pelvis is not a bone; it's three bones, right?

Dr. Franzi: That's actually four.

Mr. Aussprung: Four bones. Two hipbones, correct?

Dr. Franzi: It's two hipbones. It's the coccyx and the sacrum and it's the pubis.

Mr. Aussprung: Can we now agree the Femur is the strongest bone in the human body?

Dr. Franzi: Okay.

Mr. Aussprung: Is there a reason why when I sent you a request for admission on that—

Mr. Wright: Objection, Your Honor.

The Court: I will sustain the objection.

Mr. Aussprung: Now, when you prescribed. . . .

Trial Testimony 12/6/17, at 123-125.

Aside from his bald allegations, Appellant has failed to develop how the trial court's sustaining of the objection prejudiced him. Regardless of what Dr. Franzi had stated in response to Appellant's request for admission, Appellant's line of questioning had the desired result of obtaining Dr. Franzi's admission that the femur is the strongest bone in the body, despite some apparent earlier confusion in this regard. This final claim lacks merit.

Judgment affirmed.[6]

---

[6] This Court is not limited by the trial court's rationale and may affirm its decision on any basis. **See Commonwealth v. Cramer**, 195 A.3d 594, 607 n.5 (Pa.Super. 2018); **see also Commonwealth v. Moore**, 594 Pa. 619, 638, 937 A.2d 1062, 1073 (2007) (holding that it is a well-settled doctrine in this Commonwealth that a trial court can be affirmed on any valid basis appearing of record).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/8/19