J-S27030-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BRIAN HEDDLESTON, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF MARIA HEDDLESTON | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : : | No. 1166 WDA 2020 |
| OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES OF PITTSBURGH INC. D/B/A OB/GYN ASSOCIATES OF PITTSBURGH, RENATA D. HOCA, M.D., PEDIATRIC ALLIANCE, P.C., D/B/A THE BREASTFEEDING CENTER OF PITTSBURGH, NANCY BRENT, M.D., LUCAS GODINEZ, D.O., ALICIA HARTUNG, D.O., MAGEE-WOMENS HOSPITAL-UPMC, AND UPMC | : : : : : : : : : : : : | |

Appeal from the Judgment entered September 30, 2020
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-12-10765

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY NICHOLS, J.:          **FILED: NOVEMBER 17, 2021**

Appellant Brian Heddleston, individually and as administrator of the estate of Maria Heddleston (decedent), appeals from the judgment[1] entered

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Appellant took this appeal from the September 25, 2020 order denying post-trial motions.  However, judgments were entered in favor of all remaining defendants in this case on September 30, 2020, before Appellant filed his notice of appeal.  We have amended the caption of this appeal to reflect that

after a jury found in favor of Appellees Obstetrical and Gynecological Associates of Pittsburgh Inc. d/b/a OB/GYN Associates of Pittsburgh, Renata Hoca, M.D. (Dr. Hoca), Pediatric Alliance, P.C., d/b/a The Breastfeeding Center of Pittsburgh, Nancy Brent, M.D. (Dr. Brent), Lucas Godinez, D.O. (Dr. Godinez), Alicia Hartung, D.O. (Dr. Hartung), Magee-Womens Hospital-UPMC, and UPMC.[2] Appellant claims that the trial court erred in its rulings on the parties' standard of care evidence and when overruling his objections to electronic medical records templates and other medical records. We affirm.

The parties are familiar with the factual and procedural history of this matter. We briefly note that Appellant and his wife, the decedent, commenced this medical malpractice action in 2012. They asserted that shortly after the birth of their second child, Nathan, the decedent experienced severe pain in

---

this appeal properly lies from the final judgment entered September 30, 2020. *See Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511, 514 (Pa. Super. 1995) (*en banc*) (noting that "an appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of any post-verdict motions, not from the order denying post-trial motions" (citations omitted)).

[2] Dr. Hoca was an OB/GYN who practiced through Obstetrical and Gynecological Associates of Pittsburgh Inc. d/b/a OB/GYN Associates of Pittsburgh (OB/GYN Associates), which, in turn, was affiliated with Magee-Womens Hospital-UPMC, and UPMC (collectively, UPMC).

Drs. Brent, Godinez, and Hartung, were pediatricians who specialized in breastfeeding and lactation medicine. They practiced at Pediatric Alliance, P.C., d/b/a The Breastfeeding Center of Pittsburgh (Pediatric Alliance).

Drs. Brent, Godinez, and Hartung each obtained different attorneys. Additionally, separate counsel represented Pediatric Alliance. Dr. Hoca and UPMC were jointly represented by separate counsel.

her left breast. They claimed, in part, that the defendant-physicians failed to take appropriate steps to determine that the decedent's pain resulted from cancer while the decedent was in their care from September to October 2009. The decedent was diagnosed with Stage IV metastatic breast cancer in her left breast on October 29, 2010. Appellant and the decedent commenced their action while the decedent received cancer treatment.

In 2014, a jury issued a verdict for all defendants. On July 22, 2016, this Court remanded the case for a new trial. **Heddleston v. Obstetrical & Gynecological Assocs. of Pittsburgh, Inc.**, 443 WDA 2015, 471 WDA 2015, 490 WDA 2015, 2016 WL 4920304 (Pa. Super. filed July 22, 2016) (unpublished mem.), *appeal denied*, 169 A.3d 25 (Pa. 2017), *appeal denied* 169 A.3d 26 (Pa. 2017).[3]

Following this Court's remand, the decedent passed away on January 22, 2018. On August 2, 2018, the trial court granted Appellant leave to file a third amended complaint to substitute himself as the administrator of the decedent's estate and include wrongful death and survival causes of action. **See** R.R. at 450a-454a (Mot. to Amend Compl.), 537a (Order, 8/2/18).[4] The trial court also allowed Appellant to add Drs. Godinez and Hartung as

---

[3] This Court concluded, in part, that the trial court erred in allowing the defense's cross-examination of the decedent using slides from the Susan G. Komen website and sustaining the defense's objections to testimony from Barry Singer, M.D., Appellant's and the decedent's causation expert at the time. **Heddleston**, 2016 WL 4920304, at *3-7.

[4] We cite to the reproduced record for the convenience of the parties.

defendants. *See id.* Appellant withdrew his claims against Diana Jordan, a non-physician consultant at Pediatric Alliance. *See id.* at 606a-607a (Order, 9/17/18).

On January 9 and January 10, 2020, the trial court held a pre-trial conference on the parties' motions *in limine*. At trial, the parties presented competing fact and expert testimony concerning the nature of the decedent's pain and the significance of her pain as a symptom of breast cancer.[5] Additionally, Appellant disputed the authenticity and accuracy of Pediatric Alliance's medical records and documents. Appellant also asserted that Pediatric Alliance failed to disclose certain documents before the second trial. The parties further presented the jury with conflicting interpretations of terms and phrases used in the medical records and other documents.

Appellant presented an expert witness, Alan Kessler, M.D. (Dr. Kessler) concerning the standard of care owed by the defendant-physicians, Drs. Brent, Godinez, Hartung, and Hoca. Dr. Kessler concluded that the defendant-physicians failed to take actions to properly address the decedent's pain. Specifically, Dr. Kessler asserted that the defendant-physicians failed to take adequate histories at the decedent's visits, conduct physical examinations, and seek imaging studies. R.R. at 4246a. Dr. Kessler emphasized that the defendant-physicians should have ordered imaging studies to rule out the

---

[5] Appellant proceeded with derivative claims against Pediatric Alliance, OB/GYN Associates, and UPMC for vicarious liability for the defendant-physicians and did not assert claims of corporate negligence.

most serious problem and "make sure that there was no cancer." *Id.* at 4251a. Dr. Kessler also stated that Dr. Godinez breached the standard of care by failing to prepare and send a physician's note to Dr. Hoca. *Id.* at 4254a.

The defense called three experts to testify concerning the standard of care. First, Maya Bunik, M.D. (Dr. Bunik) testified as Dr. Brent's standard of care expert. Second, Ann Kellams, M.D. (Dr. Kellams) testified as the standard of care expert for Drs. Godinez and Hartung. Third, Jay Goldberg, M.D. (Dr. Goldberg) testified as Dr. Hoca's standard of care expert. Additionally, Drs. Brent, Godinez, Hartung, and Hoca all testified at trial. We note that Mark Pearlman, M.D. (Dr. Pearlman) testified at the first trial as Drs. Hoca and Brent's standard of care expert. However, none of the defendants called Dr. Pearlman at the second trial, although the defendants indicated Dr. Pearlman would testify.

As to causation, Appellant called Paul Tartter, M.D. (Dr. Tartter) as an expert to testify that the failure to diagnose the decedent's cancer in 2009 increased the risk of harm to the decedent. The defense called Dr. William Farrar, M.D. (Dr. Farrar) as their expert on causation.

On January 31, 2020, the jury found in favor of all defendants. Specifically, the jury determined that Drs. Brent, Hartung, and Hoca did not violate the standard of care. The jury found that Dr. Godinez was negligent, but his negligence was not a factual cause of any harm to the decedent.

Appellant timely filed post-trial motions on February 10, 2020, as well as a supplemental post-trial motion on March 4, 2020. The trial court did not

consider the timeliness of the March 4, 2020 supplemental post-trial motion, but convened a hearing on July 23, 2020 at which Appellant argued all of his issues. The trial court denied post-trial relief on September 25, 2020. The defendants praeciped for the entry of judgment on September 29 and September 30, 2020.

Appellant timely appealed and complied with the trial court's order to file and serve a Pa.R.A.P. 1925(b) statement. The trial court filed a Rule 1925(a) opinion.

Appellant presents the following questions for review:

1. Is [Appellant] entitled to a new trial as a result of the trial court's error in permitting defendant Drs. Hoca, Brent, Godinez and Hartung to testify as experts on the standard of care and to also exceed the scope of their pretrial testimony by altering it?

2. With respect to the applicable standard of care, whether the trial court committed reversible error in incorrectly permitting defense expert William Farrar, M.D. to testify outside the scope of his report while simultaneously limiting the testimony of [Appellant's] expert, Paul Tartter, M.D.?

3. Is [Appellant] entitled to a new trial as a result of the trial court's error in not permitting him to authenticate, use / publish to the jury Mark Pearlman, M.D.'s medical literature which had been authenticated, was represented as authoritative by the defense and was repeatedly referred to and relied on by the defense during the trial?

4. Is [Appellant] entitled to a new trial as a result of the trial court's error in deferring ruling on his motion *in limine* to limit cumulative expert testimony and then permitting Defendants' / Appellees' experts to testify cumulatively outside the scope of their expert reports as to a medically unsubstantiated "persistent pain" defense over multiple objections?

5. Is [Appellant] entitled to a new trial as a result of the trial court's error in permitting the defense to utilize and admit various medical records in direct violation of multiple rules of the Pennsylvania Rules of Evidence, including the admission of: "hyperlinked"[6] purported "medical records" that had not been produced in discovery or in response to court orders and not properly authenticated and were improper hearsay; as well as unauthenticated / not properly authenticated Pediatric Alliance records; and Nathan Heddleston's records which also violated the best evidence rule?

Appellant's Brief at 4-5.

## Standard of Care Evidence

In his first four claims, Appellant challenges several evidentiary rulings concerning the standard of care.[7]   Appellant's Brief at 21-23.   Appellant

_____

[6] Generally, "a hyperlink is an 'element on a webpage—usu. a word, phrase, or graphic, but sometimes a single pixel—that when clicked on, takes the user to another part of the same website or to a different website.'" **Commonwealth v. Talley**, 236 A.3d 42, 54 n.6 (Pa. Super. 2020) (quoting Black's Law Dictionary at 759 (8th Ed. 2004)), *appeal granted*, 250 A.3d 468 (Pa. 2021).   As discussed below, the "hyperlinks" in Pediatric Alliances' electronic medical records system were contained on a data entry template, which when clicked, opened additional data entry templates.

[7] It is well settled that

[a] plaintiff in a medical negligence matter is required to present an expert witness who will testify, to a reasonable degree of medical certainty, regarding the standard of care (duty); that the acts of the physician deviated from the standard or care (breach); and that such deviation was the proximate cause of the harm suffered.  Expert testimony in support of the plaintiff's claim is an indispensable requirement in establishing a plaintiff's right of action, as the treatment and injury typically involved are such that the common knowledge or experience of a layperson is insufficient to form the basis for passing judgment.

**Mitchell v. Shikora**, 209 A.3d 307, 315 (Pa. 2019) (citations omitted).

asserts that the trial court erred in permitting the defense to present repeated testimony that breast cancer manifests as "persistent pain." *Id.* Appellant claims that the trial court's rulings allowed the defense to present cumulative, "medically unsubstantiated" opinion evidence based on a "manufactured" defense. *Id.* at 24, 33.

Appellant specifically contends that the trial court erred by (1) allowing the defendant-physicians to testify as to the standard of care, (2) precluding Appellant from using a learned treatise, (3) allowing defense-experts Drs. Bunik, Goldberg, Kellams, and Farrar to testify beyond the scope of their expert reports, (4) limiting Appellant's counsel's examination of Dr. Tartter while allowing Dr. Farrar to testify concerning the standard of care, and (5) deferring Appellant's motion *in limine* seeking to limit the number of standard of care witnesses called by the defense.[8]

Appellant continues that the defense exploited the trial court's improper rulings and that the jury could not have fairly considered the proper standard of care. *See id.* at 26, 33, 42, 49. Appellant concludes that he is entitled to a new trial.

Drs. Brent, Godinez, Hartung, and Pediatric Alliance, and Dr. Hoca and UPMC respond that Appellant failed to properly preserve his appellate claims. In any event, they assert that Appellant's arguments lack merit.

---

[8] We address Appellant's arguments in a different order than presented in his brief.

This Court has summarized the principles governing the review of the denial of a motion for a new trial as follows:

Consideration of all new trial claims is grounded firmly in the harmless error doctrine which underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake. Once the trial court passes on the moving party's claim, the scope and standard of appellate review coalesce in relation to the reasons the trial court stated for the action it took. Where the court is presented with a finite set of reasons supporting or opposing its disposition and the court limits its ruling by reference to those same reasons, our scope of review is similarly limited. . . .

Our standard of review prescribes the degree of scrutiny we apply to the trial court's decision and the manner in which we evaluate its conclusions. If the trial court's challenged ruling was one of law, we review its grant or denial of a new trial on that point to discern if the court committed legal error. Similarly, if the challenged ruling involved a discretionary act, we review the disposition of the new trial motion relative to that act for abuse of discretion.

*Crespo v. Hughes*, 167 A.3d 168, 180-81 (Pa. Super. 2017) (citations omitted and formatting altered).

It is well settled that:

Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***Parr v. Ford Motor Co.***, 109 A.3d 682, 690-91 (Pa. Super. 2014) (*en banc*) (citations omitted and formatting altered).

A motion *in limine* is a pre-trial mechanism to obtain a ruling on the admissibility of evidence and enables the trial court to "weigh potentially prejudicial and harmful evidence before the trial occurs, thus preventing the evidence from ever reaching the jury." ***Id.*** at 690 (citation and quotation marks omitted). "A trial court's decision to grant or deny a motion *in limine* is subject to an evidentiary abuse of discretion standard of review." ***Id.*** (citation and quotation marks omitted).

"In order to preserve a claim that the trial court erred in overruling an objection, a party must state the specific grounds of the objection." ***Brown v. Halpern***, 202 A.3d 687, 708 (Pa. Super. 2019) (citing Pa.R.E. 103(a)(1)(B)), *appeal denied*, 217 A.3d 207 (Pa. 2019), *appeal denied*, 217 A.3d 809 (Pa. 2019). Further, this Court has stated that

> a motion *in limine* may preserve an objection for appeal without any need to renew the objection at trial, but only if the trial court clearly and definitively rules on the motion. Conversely, if the trial court defers ruling on a motion *in limine* until trial, the party that brought the motion must renew the objection at trial or the issue will be deemed waived on appeal.

***Blumer v. Ford Motor Co.***, 20 A.3d 1222, 1232 (Pa. Super. 2011) (citations omitted).

### Testimony by Defendant-Physicians

Appellant challenges testimony from the defendant-physicians, Drs. Brent, Godinez, Hartung, and Hoca. Appellant contends that the trial court improperly allowed the defendant-physicians to offer expert evidence concerning the standard of care. Appellant's Brief at 42, 48-49. Specifically, Appellant contests the admissibility of the defendant-physicians' testimony that "pain had to be persistent to be a symptom of breast cancer" and that "a persistent problem was needed for exams or further testing." *Id.* at 48-49.

By way of background, Appellant filed a motion *in limine* claiming that the expert qualifications provisions of the Medical Care Availability and Reduction of Error (MCARE) Act precluded Drs. Brent, Godinez, and Hartung from testifying as experts concerning the standard of care.[9] R.R. at 2243a-2251a (Appellant's Tenth Mot. *in Limine*). Appellant filed a separate motion *in limine* asserting that the defense agreed that Dr. Hoca would not testify concerning the standard of care. *Id.* at 2195a-2196a (Appellant's Second Mot. *in Limine*).

At the hearing on the parties' pre-trial motions, the trial court ruled that Dr. Hoca could not testify to a "retrospective standard of care." *Id.* at 2746a, 2770a. However, the trial court deferred ruling on the defense argument that Dr. Hoca could testify from her "knowledge base" and experience as an OB/GYN. *See id.* at 2746a (indicating that the trial court ruled that "we'll cross that bridge if we need to"). The trial court overruled Appellant's motion

---

[9] *See* 40 P.S. § 1303.512.

*in limine* as to Drs. Brent, Godinez, and Hartung and allowed them to testify that they believed they followed the standard of care. *Id.* at 2770a.

At trial, Appellant introduced evidence that Drs. Brent, Godinez, Hartung, and Hoca previously testified in depositions that they did not know pain was associated with cancer. The defendant-physicians testified to the following as part of their case presented at trial.

On September 21, 2009, four days after the birth of Nathan, Dr. Brent was the decedent's physician for the decedent's first breastfeeding evaluation at Pediatric Alliance. *Id.* at 3160a. Dr. Brent was a pediatrician with a subspecialty in breastfeeding medicine. *Id.* at 3153a.

At the September 21, 2009 visit, the decedent reported breast pain with pumping and described the pain as eight out of ten. Dr. Brent testified that breast pain is not unusual shortly after childbirth and "when nothing is coming out" with breast pumping. *Id.* at 3162a. Dr. Brent stated that she was familiar the signs and symptoms of breast cancer "from a general medical point of view." *Id.* at 3166a-3167a.

When asked to explain her prior deposition testimony that she did not know that pain with pumping described as eight out of ten could be associated breast cancer, Dr. Brent testified:

> Because in my medical experience I had always assumed when you are looking at diagnosis of cancer in terms of pain, the most common presentation is a painless lump, no pain. So that certainly wasn't what we had here. The other thing is that pain associated with cancer does not remit. It's persistent and it continues. And it wouldn't occur only with pumping, it would be there all the time. So I didn't know if somewhere in the literature

- 12 -

it said that, that yes, pain has been associated with pumping. That's why I said I don't know. The other thing is that I do know and that I knew back then is that advanced cancer, I think everybody in the room knows, is associated with pain, advanced cancer of any type.

*Id.* at 3167a. Dr. Brent continued that she had not seen medical literature stating that eight out of ten pain with pumping is a symptom of cancer. *Id.* Dr. Brent stated that she did not consider cancer because she had an explanation for the pain "in that [the decedent] had low milk supply." *Id.*

On September 28, 2009, Dr. Godinez was the decedent's physician for the decedent's follow-up evaluation at Pediatric Alliance. Dr. Godinez was a pediatrician, who was certified as a lactation consultant. *Id.* at 3239a-3240a. Dr. Godinez testified that breast pain with pumping was common. *Id.* at 3256a.

When asked to explain his prior deposition testimony that he did not know pain was a sign of breast cancer, Dr. Godinez stated:

At that time when I was asked, it was a very general question about can pain with the breast be associated with cancer, and I said I don't know. And those were my words. And at that time the very general question, a very general answer for me. I think it's important to recognize that there should be an understanding of whether this is a woman who is lactating versus a woman who is not. I think you have to understand history as a risk factor as well for that. Is there a history of breast cancer with the family or not? And the age of the patient. There are multiple factors that go along with it. So at the time, to say breast pain by itself associated with cancer, I said I don't know because I think that it is not a specific thing that I learned, nor is it anything that I'm aware of, that it is pain only by itself.

*Id.* at 3260a.

Dr. Godinez also responded to Appellant's expert evidence that he should have referred the decedent for further diagnostic testing. *Id.* Specifically, Dr. Godinez stated:

> You are again seeing a patient at a moment in time, and at that moment in time she is in the office with us, we have to take in what is currently going on with her and what has changed from her prior visit, since this was a follow-up consultation. There was no indication of pain, ongoing pain, persistent pain. She also was not pumping. At that time there wasn't any pain that she reflected on at all in that visit. So I felt no immediate need nor urgency that we needed to do any further follow-up for that pain at that point. I felt that because of the measures that Dr. Brent did in the prior visit, that the specific treatment plan that she went over with [the decedent], how to help get her milk supply, addressed that issue of a low milk supply and possibly helping to get that supply up, but also that she was not having any pain at the visit when I saw her so I felt things had been corrected.

*Id.* at 3260a-3261a.

On October 6, 2009, Dr. Hartung was the decedent's physician for the decedent's third visit to Pediatric Alliance. Dr. Hartung was a pediatrician, who was certified as a lactation consultant. *Id.* at 3316a. Dr. Hartung noted that "[f]requently moms that are lactating can have pain early on [or] pain with pumping . . . but that pain should improve." *Id.* at 3322a. Dr. Hartung testified that she had not encountered any patient who had persistent pain in her practice. *Id.* If the pain was persistent, she would refer the patient back to the OB/GYN for testing. *Id.*

When asked to explain her prior deposition testimony that she did not know pain was a sign of breast cancer, Dr. Hartung testified:

I did not know. I am not an oncologist, I am not an OB/GYN. Even after sitting in this courtroom for last two weeks I'm still unsure that pain can definitely be a diagnostic sign of breast cancer. However, what I do know is any type of persistent pain that is not improving with the modalities that have been tried needs to be further investigated.

*Id.* at 3324a.

On October 26, 2009, Dr. Hoca was the decedent's physician for her postpartum examination. Dr. Hoca was the decedent's OB/GYN since the decedent was a teenager and provided care before and after the birth of Nathan.

Dr. Hoca and UPMC's counsel elicited Dr. Hoca's testimony concerning her personal experiences diagnosing cancer. *Id.* at 3337a. Additionally, Dr. Hoca testified concerning the symptoms of cancer in the following exchange:

[Dr. Hoca and UPMC's Counsel:] In your experience, Doctor, with patients who have ultimately been diagnosed with breast cancer, what is their most common presentation that leads to further investigation?

[Dr. Hoca:] A painless mass.

Q A painless mass?

A Yes.

Q Doctor, in your education, training, and experience, up to the present time, have you ever been involved in the care of a patient where you determined that a transient complaint of pain during lactation when pumping was a sign of breast cancer?

A Never.

*Id.*

- 15 -

Dr. Hoca did not perform a breast examination at the postpartum examination. Dr. Hoca explained her practice of doing a "directed physical examination" of the area where her patients report pain. *Id.* at 3346a. Therefore, she would not conduct a breast examination if there was "no current complaint [or] persistent issue." *Id.* Dr. Hoca concluded that based on her review of the decedent's records, the decedent's "breast related symptoms were gone." *Id.* at 3347a.

Dr. Hoca also explained that she did not order or refer the decedent for further testing because:

> You do testing based on whether there is a persistent problem. If you have a transient problem that is addressed, the most likely diagnosis and the treatment in relation to your working diagnosis is effective to a certain degree. At least in [the decedent's] case when it comes to pumping, production, and effective completely, according to the chart, as far as resolution of pain, there is no indication to go further, or do additional studies.

*Id.* at 3347a-3348a. Appellant did not object to Dr. Hoca's testimony concerning pain as a symptom of cancer.

In a further exchange with counsel for Dr. Brent, Dr. Hoca testified:

> [Dr. Brent's Counsel:] Doctor, you were asked questions about this pain with pumping, this transient complaint of pain with pumping. Have you ever heard of pain with pumping being a sign of breast cancer?

> [Dr. Hoca:] Never heard it, never read it, have not seen a case report, no.

*Id.* at 3349a.[10]

On appeal, Appellant asserts that Dr. Hoca's testimony on the standard of care violated the trial court's pre-trial ruling. Appellant's Brief at 48-49. Appellant notes that defense counsel represented Dr. Hoca would only testify as a fact witness at Dr. Hoca's deposition, but elicited Dr. Hoca's expert standard of care testimony at trial. *Id.*

Appellant also argues that the trial court erred in overruling his motion *in limine* that Drs. Godinez and Hartung were incompetent to testify regarding the standard of care pursuant to the MCARE Act. Appellant's Brief at 45. Appellant asserts that the decedent "was an adult patient and discussing standard of care for non-adult patients only served to substantially confuse the jury and prejudice [Appellant]." *Id.* at 48.

Lastly, Appellant claims that the trial court rulings permitted Drs. Brent, Godinez, Hartung, and Hoca to testify inconsistently with their prior testimony. *Id.* Appellant contends that the defendant-physicians "went from having no knowledge of pain and its association with cancer prior to trial, to inconsistently and miraculously at trial becoming not just knowledgeable about pain and its association with cancer, but that pain had to be persistent to be a symptom of breast cancer." *Id.* at 48-49.

---

[10] Appellant objected at this point but sought to cross-examine Dr. Hoca using an article written by Dr. Pearlman.

Initially, we conclude that Appellant's challenge to Dr. Hoca's testimony is waived. At the pre-trial hearing, although the trial court stated that Dr. Hoca could not testify concerning "retrospective standard of care," the trial court also stated that it would "cross that bridge if we need to" when the defense argued that Dr. Hoca could testify concerning her personal knowledge base and experiences as an OB/GYN. *Id.* at 2746a, 2770a. Thereafter, Appellant neither objected to the alleged violation of the trial court's pretrial ruling, nor did he renew his objections that Dr. Hoca's could not provide standard of care testimony. *See Blumer*, 20 A.3d at 1232. Accordingly, we find that Appellant waived his argument that the trial court erred in permitting Dr. Hoca to testify in support of the defense's persistent pain theory. *See* Pa.R.E. 103(a)(1)(B); *Brown*, 202 A.3d at 708; *Blumer*, 20 A.3d at 1232.

As to Drs. Brent, Godinez, and Hartung, it is well settled that the MCARE Act provides heightened requirements for qualifying experts than the common law. *See Gbur v. Golio*, 963 A.2d 443, 452-53 (Pa. 2009). Section 1303.512 states:

> **(a) General rule.—**No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> **(b) Medical testimony.—**An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

**(c) Standard of care.—**In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

**(d) Care outside specialty.—**A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

**(e) Otherwise adequate training, experience and knowledge.—**A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in

the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512.

Instantly, Appellant sued Drs. Brent, Godinez, and Hartung claiming that they were negligent for failing to take steps to diagnose cancer during the decedent's visits to Pediatric Alliance for breastfeeding issues. Appellant cites no case law, nor do we discern a basis in Section 1303.512 to preclude Drs. Brent, Godinez, and Hartung's testimony regarding their understanding of the symptoms of cancer, or their beliefs that the decedent did not show symptoms of breast cancer that required further diagnostic imaging. Because Appellant claimed Drs. Brent, Godinez, and Hartung were negligent when the decedent was in their care as breastfeeding and lactation specialists, we cannot conclude that the MCARE Act precluded their testimony that they believed they acted reasonably under the circumstances. Accordingly, Appellant fails to establish that the trial court erred or abused its discretion when permitting Drs. Brent, Godinez, and Hartung's testimony over his MCARE Act objection.

Lastly, as to Appellant's contention that the trial court permitted the defendant-physicians to testify inconsistently with their prior testimony, we conclude no relief is due. Appellant's assertion goes to the weight not the admissibility of evidence. *See generally Martin v. Evans*, 711 A.2d 458, 463 (Pa. 1998) (noting that "[c]redibility determinations are within the sole province of the jury" and that "a jury can believe any part of a witness' testimony that they choose, and may disregard any portion of the testimony

that they disbelieve" (citation and quotation marks omitted)); ***Commonwealth v. McCrae***, 832 A.2d 1026, 1035 (Pa. 2003) (noting that an appellant's argument based on inconsistencies between preliminary hearing and trial testimony were "classic points affecting evidentiary weight and not admissibility" (citation omitted)). Therefore, this argument fails.

## Dr. Pearlman's Writing

Appellant claims that the trial court denied him an opportunity to cross-examine Dr. Kellams, who was Drs. Godinez and Hartung's standard of care expert, with a writing co-authored by Dr. Pearlman, a defense expert who did not testify at the second trial. Appellant's Brief at 22-23, 50-59. Appellant asserts that Dr. Pearlman's writing "is a learned treatise" that "would have been a 'silver bullet' through the heart of the fabricated 'persistent pain' defense." ***Id.*** at 52, 58.

Appellant contends that he established the writing was authentic through Dr. Pearlman's testimony at the first trial. ***Id.*** at 57. Appellant also argues that the defense essentially vouched for Dr. Pearlman's authoritativeness by calling him as a witness in the first trial, representing that Dr. Pearlman would testify at the second trial, and referring to him during the qualifications of their other experts at the second trial. ***Id.*** Appellant asserts that the defense's late decision not to call Dr. Pearlman precluded him from properly authenticating Dr. Pearlman's writing through his own experts. ***Id.*** at 53. Appellant continues that Dr. Kellams cited Dr. Pearlman's article and testimony in her expert report. ***Id.*** at 58. Alternatively, Appellant

contends that the trial court improperly limited his attempts to establish a foundation for the article during cross-examination of Dr. Kellams. ***Id.***

This Court has stated:

Our rules of evidence do not recognize a hearsay exception for a learned treatise. A learned treatise is any textbook, published work, or periodical that has been accepted as authoritative or as reliable authority by members of a specific professional community. Under Pennsylvania law, the contents of a learned treatise offered at trial to establish principles or theories is inadmissible hearsay, an extrajudicial declaration offered to prove the truth of the matter asserted. Experts may rely on authoritative publications in formulating their opinions, and, to a limited extent, our courts permit experts to briefly reference materials to explain the reasons underlying their opinions. While such materials are not admissible, an expert may be impeached with statements contained in a text or publication deemed authoritative or reliable by him or other experts in the same field.

\* \* \*

The law in this Commonwealth is well-settled that an expert witness may be cross-examined on the contents of a publication upon which he or she has relied in forming an opinion, and also with respect to any other publication which the expert acknowledges to be a standard work in the field. In such cases, the publication or literature is not admitted for the truth of the matter asserted, but only to challenge the credibility of the witness's opinion and the weight to be accorded thereto. Learned writings which are offered to prove the truth of the matters therein are hearsay and may not properly be admitted into evidence for consideration by the jury.

***Charlton v. Troy***, 236 A.3d 22, 38-39 (Pa. Super. 2020) (citations and footnote omitted and formatting altered), *appeal denied*, 251 A.3d 772 (Pa. 2021).

Instantly, Appellant sought to use Dr. Pearlman's writing, titled "Common Breast Problems." Therein, Dr. Pearlman wrote that "isolated focal pain in any age woman requires appropriate diagnostic imaging." R.R. at 3233a, 3235a. At a sidebar conference, the trial court ruled that Appellant could ask Dr. Kellams about the writing but could not "get into . . . the pain aspect." *Id.* at 3235a. The trial court noted that "it's different if" Dr. Kellams acknowledged that the writing was authoritative. *Id.*

Appellant then sought to establish a foundation for cross-examining Dr. Kellams with the "Common Breast Problems" article in an exchange that covered seven pages of the transcript. Appellant, without success, attempted to refresh Dr. Kellams' recollection as to whether she read Dr. Pearlman's writing, and questioned her if she knew "what it means for an article to be authoritative," if the writing was generally accepted as being accurate, and whether she accepted Dr. Pearlman's prior testimony and expert report as authoritative. *Id.* 3235a-3236a. Finally, when Appellant asked whether viewing the article refreshed Dr. Kellams' recollection, defense counsel objected based on the question being asked and answered. *Id.* at 3236a. When the trial court sustained the objection, Appellant moved to a different topic in cross-examination. *Id.*

Based on the foregoing, we discern no merit to Appellant's contention that he established a foundation to use Dr. Pearlman's writing or that the trial court denied him an opportunity to attempt to use the article as a learned treatise. The trial court gave Appellant considerable latitude to establish that

the writing was authoritative.  However, Appellant failed to elicit Dr. Kellams'

testimony that the writing was "accepted as authoritative or as reliable

authority by members of a specific professional community."[11]  **See Charlton**,

236 A.3d at 38-39.  Therefore, no relief is due.

## Fair Scope of Expert Reports

Appellant claims that the trial court erred in permitting defense standard

of care experts, Drs. Bunik, Goldberg, and Kellams, to testify beyond the scope

of their expert reports.  Appellant's Brief at 30-31.  Additionally, Appellant

asserts that the defense causation expert Dr. Farrar testified beyond the scope

of his expert report.  **Id.** at 31.

This Court has stated:

Pennsylvania Rule of Civil Procedure 4003.5 requires parties to
timely submit their expert reports, and confines the expert's
testimony to the scope of those reports, to avoid unfair surprise.
In such situations, trial courts may exclude the offending
testimony entirely or, in some cases permit the opposing party to
depose the witness during trial.

---

[11] Appellant cites no legal authority for the proposition that the use of a writing
at one trial establishes a proper evidentiary foundation at a new trial when
the writing is used for different purposes.  In any event, we note that although
Appellant was able to cross-examine Dr. Pearlman using his article at the first
trial, there was no indication that the article was accepted as a learned
treatise.  Additionally, although not heard by the jury at trial, Appellant
unsuccessfully attempted to establish a foundation for the use of "Common
Breast Problems" during the video deposition of his standard of care expert
Dr. Kessler.  R.R. at 3565a.  Therefore, the record does not support Appellant's
assertion that the late decision by the defense not to call Dr. Pearlman
prevented him from authenticating the writing through his own experts.

*Gregury v. Greguras*, 196 A.3d 619, 630-31 (Pa. Super. 2018) (*en banc*) (citations omitted).

"No hard and fast rule exists for determining when a particular expert's testimony exceeds the fair scope of his or her pre trial report, and we must examine the facts and circumstances of each case." *Woodard v. Chatterjee*, 827 A.2d 433, 442 (Pa. Super. 2003) (citation omitted and formatting altered). A court's inquiry focuses on "whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response." *Id.* (citation and emphasis omitted); *accord Hassel v. Franzi*, 207 A.3d 939, 951 (Pa. Super. 2019), *appeal denied*, 218 A.3d 862 (Pa. 2019).

Instantly, Appellant's objections were not sufficiently specific as to preserve his arguments concerning testimony beyond the fair scope of the experts' reports. *See* R.R. at 3055a (objecting to "leading" when defense counsel asked Dr. Bunik whether breast pain would be "persistent, focal, and without obvious explanation"). Even when Appellant objected to the questions or testimony being outside the scope of an expert report, his arguments did not focus on a diagnosis of cancer requiring persistent pain as a symptom. *See id.* at 3082a-3083a (objecting to Dr. Goldberg's testimony as being "outside the scope of his report" but arguing at sidebar that the testimony exceeded the scope of his report because it went to causation). *See id.* at

3206a (objecting to Dr. Kellams' testimony for being outside the scope of her report but asserting that she was not an oncologist and that her testimony concerning pain and "persistent, often worsening" pain was "speculative"). Appellant also did not object to the exchange in which Dr. Farrar testified that pain can be associated with cancer but is "usually a persistent pain that's lasted over a period of time." **See id.** at 3132a. Therefore, we conclude that Appellant's fair scope arguments are waived because his trial objections were not sufficiently specific.[12] **See Hassel**, 207 A.3d at 951; **Brown**, 202 A.3d at 708.

However, even if Appellant preserved his arguments, no relief is due. Appellant correctly notes that none of the expert reports used the phrase "persistent pain." However, the expert reports filed by Drs. Bunik, Goldberg, Kellams, and Farrar fairly suggested the concept of persistent pain as a symptom of cancer when they concluded that the defendant-physicians met their standards of care because the decedent's pain was "transient" or had "resolved." **See** R.R. at 1126a (indicating Dr. Bunik stated that "the pain complaints were consistent with a mother with minimal milk supply seeking support for lactation"), 993a-994a (indicating Dr. Goldberg concluded that "breast cancer would certainly not be suspected . . . given resolution of the breast pain"), 853a (indicating that Dr. Kellams concluded that care was appropriate because the decedent's initial complaint of pain "resolved

_____

[12] We note that Appellant's post-trial motion did not assert that the defense's experts testified outside of the scope of their reports.

completely"); **see also id.** at 1036a (indicating that Dr. Farrar concluded that the decedent's "isolated complaints of what became transient pain while attempting to breastfeed (pumping), is not suspicious for breast cancer"). Therefore, we discern no basis for Appellant to assert that he was unfairly surprised by the testimony and defense concerning "persistent pain." **See Hassel**, 207 A.3d at 951; **Woodard** 827 A.2d at 442.

For these reasons, Appellant's claim based on the fair scope of the defense's expert reports merits no relief.

**Questioning of Drs. Tartter and Farrar**

Appellant contends that the trial court improperly limited his redirect examination of his causation expert, Dr. Tartter, while permitting the defense causation expert, Dr. Farrar to discuss the standard of care. Appellant's Brief at 41-42. Appellant asserts that the defense opened the door to standard of care testimony by Dr. Tartter by implying that the decedent "never had any sign or symptom of breast cancer that would warrant diagnostic imaging." **Id.** at 33. Appellant continues that the defense "duped" the trial court to sustain their objections to his proposed redirect asking whether eight out of ten breast pain was a symptom of cancer. **Id.** at 34-39.

As to Dr. Farrar, Appellant asserts that the defense advised the court that Dr. Farrar would not be providing standard of care testimony.[13] **Id.** at 40. Appellant contends that the defense thereafter elicited Dr. Farrar's

_____

[13] Appellant adds that Dr. Farrar testified outside of the scope of his reports.

testimony concerning persistent pain as a symptom of cancer. Appellant notes that defense counsel also "guided **twice** to (falsely) point out the 'absence' of literature regarding 'transient' pain as a sign or symptom of breast cancer." *Id.* at 41. Appellant argues that the inconsistent rulings between the two experts "unfairly tipped the scale" in favor of Appellees. *Id.* at 42. Appellant emphasizes that defense counsel took inconsistent positions when objecting to Dr. Tartter's testimony and eliciting testimony through Dr. Farrar. *Id.*

*Dr. Tartter*

Following qualifications at trial, the defense objected to Dr. Tartter testifying concerning the standard of care based on the MCARE Act. The trial court sustained the objections and limited Dr. Tartter's testimony to causation.

Appellant's claim that the defense opened the door to Dr. Tartter's standard of care testimony focuses on the following exchange with counsel for Dr. Hoca and UPMC:

> [Counsel for Dr. Hoca and UPMC]: Now, with respect to symptoms, because you were provided those records, from the time period of the postpartum visit with Dr. Hoca up to the presentation at Dr. Donaldson's office, there was no medical or treatment record of any kind where the patient reported any symptoms that you as a breast surgeon would associate with breast cancer?
>
> [Dr. Tartter:] Correct. With breast cancer or breast metastases?
>
> Q. Breast cancer.
>
> A. Well, she had pain in the breast.
>
> Q. I said from the postpartum visit --
>
> THE COURT: You should say the date.

Q. Postpartum visit October 26th, '09, you will agree with me that there is no report of pain in Dr. Hoca's visit?

A. There is no report of pain, correct.

Q. I said a record. So there is no record of any kind from October 26, '09 until the presentation at the emergency room in August of 2010 of any symptoms that you even as a breast surgeon would associate with breast cancer? In an office note, anywhere, PCP, endocrinologist, anywhere. There is no report of a symptom of that kind?

A. Correct.

R.R. at 2903a-2904a.

At a sidebar conference, Appellant asserted that he should be permitted to ask if Dr. Tartter believed whether the decedent had any symptoms of breast cancer before October 26, 2009, because the defense asked questions about her symptoms after October 26, 2009. *Id.* at 2912a. Defense counsel all objected. The trial court ultimately sustained the objection, although the trial court's basis for sustaining the defense objection to Appellant's redirect examination is unclear from the record.

On appeal, Appellant contends that at the sidebar conference, counsel for Dr. Hoca and UPMC misrepresented the record to the trial court. Appellant's Brief at 34-39. Specifically, Appellant asserts that contrary to counsel for Dr. Hoca and UPMC's objection based on the scope of Dr. Tartter's report, Dr. Tartter discussed pain throughout his report. *Id.* at 36-38. Appellant further claims that opposing counsel falsely stated that his cross-examination questions concerned metastatic cancer when the questioning related to symptoms of breast cancer. *Id.* at 33-36.

Instantly, we conclude that Appellant was not prejudiced by the trial court's limitation on his redirect question to Dr. Tartter. As noted above, when counsel for Dr. Hoca and UPMC asked whether the medical record contained reference to breast cancer symptoms, Dr. Tartter initially replied, "Well, she had pain in her breast." *Id.* at 2904a. Additionally, Dr. Tartter referred to pain being associated with breast cancer during examinations on his qualifications and in his direct testimony. *See id.* at 2881a (responding that pain associated with breast cancer is "well documented"), 2896a (responding that he believed the decedent had Stage II or III cancer in 2009 because "her only symptom in 2009 was related to the left breast where she had the discomfort"). For these reasons, we cannot conclude that the trial court's preclusion of Appellant's intended question to Dr. Tartter about an "eight of ten pain as a symptom of breast cancer" affected the outcome of the trial. *See Parr*, 109 A.3d at 690-91.

*Dr. Farrar*

As to Dr. Farrar, the record establishes that Appellant requested an offer of proof before Dr. Farrar testified. During the offer, Appellant objected to Dr. Farrar giving standard of care testimony and stated that the testimony was cumulative to Dr. Goldberg's testimony. Counsel for Dr. Hoca and UPMC argued that Dr. Farrar would not express expert opinions as to the standard of care, that is, the doctor would not testify regarding what the defendant-physicians should or should not have done in 2009. R.R. at 3125a. However, counsel maintained that Dr. Farrar could testify consistent with his report and

- 30 -

"talk about [how] he diagnoses breast cancer, [and] what the symptoms of breast cancer are . . . ." *Id.* The trial court overruled Appellant's objections. *Id.* at 3127a.

As noted above, Appellant contends on appeal that defense counsel acted inappropriately when eliciting standard of care testimony from Dr. Farrar and contrasts their respective proffers and objections concerning Dr. Farrar and Dr. Tartter. Appellant, however, fails to argue that the trial court erred in overruling Appellant's objections during the offer of proof, or in failing to preclude Dr. Farrar's standard of care testimony. Appellant does not expressly assert that Dr. Farrar was unqualified or incompetent to testify concerning the standard of care. Therefore, we find Appellant's appellate argument as to Dr. Farrar underdeveloped and decline to address Dr. Farrar's testimony as an independent basis for appellate relief. *See Harris v. Toys "R" Us-Penn*, *Inc.*, 880 A.2d 1270, 1279 (Pa. Super. 2005); *see also* Pa.R.A.P. 2119(a).

**Cumulative Evidence**

In addition to the individual evidentiary rulings discussed above, Appellant presents a separate and overarching claim that the trial court erred in deferring its ruling on his motion *in limine* to preclude cumulative evidence pursuant to Pa.R.E. 403. Appellant's Brief at 26-27. Appellant claims that by deferring its ruling, "[t]he trial court was led into multiple evidentiary errors relating to the pseudo-science 'persistent pain' defense that was allowed to be cumulatively presented to the jury by multiple defense experts and thus prejudiced [Appellant]." *Id.* at 24.

- 31 -

Appellant asserts that:

> while an argument could be made that the testimony of Drs. Goldberg and Farrar were not cumulative because they practiced in different fields of medicine, the same cannot be said for the five board certified pediatricians [Drs. Bunik and Kellams, and defendant-physicians Drs. Brent, Godinez, and Hartung] who offered the same standard of care opinions on behalf of [Pediatric Alliance and Drs. Brent, Godinez and Hartung]. The trial court abused its discretion in permitting this cumulative testimony.

*Id.* at 25.

Throughout his brief, Appellant refers to the defense case as the beating of a "'persistent pain' drum." *Id.* at 31. Appellant repeatedly refers to the "'persistent pain' defense" as "falsified," "manufactured," or "fabrication." *Id.* at 32-33, 49, 57, 58. Appellant further contends that the defense exploited the trial court's evidentiary rulings. Appellant notes that counsel for Dr. Hartung, in closing argument, referred to Dr. Kessler, Appellant's standard of care expert, as a "lone wolf." *Id.* at 32. Appellant concludes that the record establishes that he "was prejudiced as [the defense] exploited the cumulative imbalance to their advantage, as [he] was permitted only one standard of care expert . . . while the defense was permitted to cumulatively put **eight** physicians before the jury on the same issue." *Id.* (formatting altered and emphasis in original).

Pennsylvania Rule of Evidence 403 states:

> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

- 32 -

Pa.R.E. 403. "Prejudice does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis." *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 585 (Pa. Super. 2003) (citation and quotation marks omitted); *see also* Pa.R.E. 403 cmt. (stating that "'[u]nfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially").

Initially, we note that Appellant's claim based on the cumulative evidence is subject to waiver. The trial court deferred ruling on Appellant's motion *in limine*. Except for a passing reference to the testimony of defense-experts Drs. Goldstein and Farrar being cumulative, Appellant did not renew his objections based on Rule 403 as to the defendant-physicians, or defense-experts Drs. Bunik and Kellams. Further, Appellant did not object to the repeated testimony concerning persistent pain as cumulative at trial. Therefore, we could find Appellant's claim waived. *See* Pa.R.E. 103(a)(1)(B); *Brown*, 202 A.3d at 708; *Blumer*, 20 A.3d at 1232.

In any event, we conclude that Appellant's arguments based on Rule 403 merits no relief. First, the trial court did not limit the number of standard of care experts Appellant could present. Rather, it appears that Appellant voluntarily declined to call other possible experts who had testified at the first trial and that Appellant listed as possible witnesses for the second trial.

Second, the defendant-physicians' care of the decedent involved different standards of care under different circumstances. The three

defendant-physicians at Pediatric Alliance were pediatricians responsible for the decedent's care for breastfeeding and lactation evaluations, with Dr. Brent conducting the first evaluation on September 21, 2009, Dr. Godinez conducting a follow-up on September 28, 2009, and Dr. Hartung conducting an additional follow-up on October 6, 2009. Each were responsible for the decedent's care with different information available to them. Similarly, as Appellant emphasizes Dr. Hoca was the OB/GYN responsible for the decedent's postpartum care and had information from the decedent's visits at Pediatric Alliance. Therefore, we discern no error in the trial court's decision to defer ruling on Appellant's motion *in limine* based on Pa.R.E. 403 and in permitting more than one expert to testify. **Cf. Hassel**, 207 A.3d at 953 (rejecting a cumulative testimony argument when experts "approached the standard of care issue" from different clinical perspectives).

Third, the record does not support Appellant's contention that the defense falsified their persistent pain theory under the facts and circumstances of this case. Indeed, on cross-examination, Appellant's standard of care expert, Dr. Kessler, clarified that he did not believe diagnostic imaging testing was necessary if the decedent was not suffering pain at the September 28, October 6, and postpartum examinations. R.R. at 4222a, 4226a.

Lastly, we note that the trial court instructed the jury as follows:

You must weigh the evidence and evaluate the believability of the witnesses in order to decide the facts in this case. The number of witnesses and the number of exhibits offered by a party does not,

alone, decide the weight of the evidence. The believable testimony of one witness presented by one party may outweigh the testimony of many witnesses presented by another party.

Only if the evidence presented by the parties seems equally believable in weight and believability, should you consider the number of witnesses presented by a party in reaching your verdict.

*Id.* at 3511a. This instruction is consistent with Pennsylvania Suggested Standard Jury Instruction 5.20. *See* Pa.SSJI (Civil) 5.20. The law presumes that the jury followed the trial court's instruction.[14] *Maya v. Johnson & Johnson*, 97 A.3d 1203, 1222 (Pa. Super. 2014)

Accordingly, we discern no basis to disturb the trial court's denial of Appellant's motion for a new trial based on the repeated testimony concerning the defendant-physicians' decisions not to order diagnostic testing based on the absence of persistent pain. *See Crespo*, 167 A.3d at 180-81; *Parr*, 109 A.3d at 690-91.

---

[14] We add that defense counsel's "lone wolf" statement at closing argument provides no further basis for relief. We note that the lone wolf comment specifically referred to Dr. Kessler's opinion that Dr. Hartung may have only physically examined the decedent's right breast at the October 6, 2009 visit. *See* R.R. at 3445a. Even if the statement concerned pain as a symptom, Appellant, as discussed above, has not established that severe pain alone under the circumstances of this case required a diagnosis of cancer or the need for diagnostic imaging to rule out cancer. Indeed, even if we were to consider Appellant's arguments based on Dr. Pearlman's article, we note that at the first trial, Dr. Pearlman explained during cross-examination that his recommendation that isolated, focal breast pain required diagnostic imaging was not intended to cover lactating women. *See id.* at 426a. Dr. Pearlman also considered the decedent's complaint of "pain" to be "tenderness" because it was caused by the external force of the breast pump. *See id.* at 404a.

**Pediatric Alliance's Records**

In his last two claims, Appellant challenges the admissibility of records from Pediatric Alliance. Appellant's Brief 23, 60-68. By way of background to this claim, Dr. Godinez testified that Pediatric Alliance utilized an electronic medical records system in 2009, when the decedent was in the care of Drs. Brent, Godinez, and Hartung. The system permitted the non-physician lactation consultant, Jordan, and the physicians to enter information through data entry templates connected with a "Lactation Group Visit" page.[15] R.R. at 3245a. The system could print information from the data entered from the Lactation Group Visit page in the form of a printed medical record as well as correspondence to other physicians, such as Dr. Hoca.

Further, Pediatric Alliance maintained two sets of written medical records, one for the child (Nathan's records) and one for the parent (the decedent's records). According to Dr. Godinez, there were separate processes for printing the records for Nathan and the decedent. Pediatric Alliance also maintained an "audit trail" that purported to log who created, accessed, and modified the records.

The parties litigated the numerous issues concerning the medical records throughout discovery, which included the printing and disclosure of the decedent's records in 2012, after Appellant and the decedent commenced

---

[15] For example, if a user clicked on the phrase "Breast Feeding Assessment" on the Lactation Group Visit page, a second data entry template would open and permit the user to enter additional data.

the present action. During the discovery litigation, Pediatric Alliance provided additional records and the parties deposed two Pediatric Alliance employees in 2014, shortly before the first trial. One of those employees, Gary Janchenko, testified that in 2012, he printed "screen shots of the [L]actation [G]roup [V]isit that were completed by either [Jordan or Dr. Godinez]" for the September 28, 2009 visit to Pediatric Alliance. R.R. at 192a (referencing a deposition exhibit Appellant marked as Exhibit 20). Janchenko also confirmed that in reference to a document that Appellant marked as Exhibit 25 in the deposition, he printed screenshots of the actual data in a data template but did not create the data contained therein. *Id.* at 198a.

At the second trial, issues concerning the authenticity of the Pediatric Alliance records continued to be the subject of litigation. However, when raised by the trial court during a sidebar conference, Appellant stated that at the deposition, Janchenko brought "his deposition documents that he authenticated." *Id.* at 2943a. Appellant then stated:

> [T]he records have already been authenticated at deposition. That's why we did the deposition so we wouldn't have to do it again here. If we just agree that those records were produced at that deposition, the data files, were authentic -- the data files they produced -- then they're going to agree, I think, that they're authentic. Then we don't call Janchenko. But because I know then I don't to try to prove the authenticity, and then I can use it on [c]ross if I had to.

*Id.*

Although the parties did not immediately agree to Appellant's proposal, the following day, counsel for Pediatric Alliance represented:

> With Paul's [apparently referring to the trial court's law clerk, Paul Dachille, Esq.] help last night, we have a stipulation that the medical records attached [to a Pediatric Alliance employee's affidavit] and the records that are base [sic] stamped with data followed by a number, which we say starts with data 0001 through 1157. And those are authenticated.

*Id.* at 2957a. Subsequently, when discussing his objections to the defense's use of Nathan's records, Appellant noted that "we agreed that the data records are authentic" but disputed the authenticity of the medical records. *Id.* at 3005a.

At trial, the trial court overruled Appellant's objections that the medical records were not authentic and that the "best evidence" of the care that Drs. Brent, Godinez, and Hartung provided were reflected in the decedent's record and not Nathan's record. The defense thereafter used the Group Lactation Visit templates as exhibits when questioning Drs. Godinez and Hartung and the lactation consultant, Jordan. Those exhibits included colored hyperlinks that purported to indicate whether the user clicked a particular condition prompting the user to add additional information. Additionally, the parties both used the decedent and Nathan's records.

In its Rule 1925(a) opinion, the trial court found no error concerning Pediatric Alliance's records because Appellant stipulated to their authenticity. Trial Ct. Op., 11/30/20, at 9. The trial court further concluded that Appellant failed to establish a violation of the best evidence rule. *Id.*

On appeal, Appellant focuses his admissibility challenges to Defense Exhibits 5620A, 5621A, 6205A, 6206A, 6293A and 6294A, the Group Lactation

Visit templates that contained the colored hyperlinks. Appellant's Brief at 63. Appellant contends that Pediatric Alliance did not disclose the existence of the documents before trial. *Id.* at 64. Appellant continues that he did not stipulate to the authenticity of the templates and repeatedly objected to their use. *Id.* at 64-65. Appellant claims that the defense failed to authenticate the exhibits through their witnesses at trial. *Id.* at 65.

Additionally, Appellant asserts that the defense used the exhibits for hearsay purposes by asserting that blue hyperlinks meant that the user did not click a condition such as breast pain to enter additional information. *Id.* at 63. Appellant contends that the exhibits prejudiced him because they permitted the defense to (1) rebut Appellant's evidence that she reported pain at all three visits at Pediatric Alliance, (2) impeach the credibility of the decedent's prior testimony that she reported pain, and (3) establish that a physician saw the decedent at her visits at Pediatric Alliance. *Id.* at 67.

Appellant also asserts that the trial court erred in admitting Nathan's records because "[t]he best evidence as to what occurred with [the decedent] during her September 28[, 2009 visit at Pediatric Alliance] would have been contained in [the decedent's] record." *Id.* at 67. According to Appellant, "[a]dmission of such records served only to confuse the jury as to what actually occurred on September 28 with [the decedent's] visit—particularly given the material inconsistency in the records about pain." *Id.* at 68.

Following our review, we conclude that the record supports the trial court's conclusion that Appellant stipulated to the authentication of the

Lactation Group Visit templates. Appellant suggested a stipulation based on the prior deposition of Janchenko, and the parties apparently agreed to the next day. **See** R.R. at 2943a, 2957a. Appellant later stated that he agreed to the authenticity of the "data records." **See id.** at 3005a.

Notably, each of the exhibits challenged by Appellant on appeal also bears a stamp within the range of the data files stipulated to by Appellant. **See id.** at 4079a-4080a (showing Defense Exhibits 5620a and 5621a bore stamps of "DATA 0019" and "DATA 0020," respectively), 4095a-4096a (showing Defense Exhibits 6205a and 6206a bore stamps of "DATA 000566" and "DATA 000567," respectively), 4410a-4411a (showing Defense Exhibits 6293a and 6294a bore stamps of "DATA 000654" and "DATA 000655," respectively). Further, Appellant apparently referred to the Group Lactation Visit templates at Janchenko's deposition in 2014 and elicited testimony that Janchenko printed screenshots of the templates but could not alter the data contained in the templates. **See id.** at 192a, 198a.

Accordingly, we discern no merit to Appellant's claims that Pediatric Alliance failed to disclose to the Group Lactation Visit templates and that he did not stipulate to the authenticity of the challenged data files.[16] Therefore, Appellant fails to establish an abuse of discretion in the trial court's decision to overrule Appellant's objections to Group Lactation Visit templates.

---

[16] We add that Appellant cites no authority for the proposition that the color indicating whether a hyperlink has been clicked constitutes an out of court statement made by a declarant for the purpose of a hearsay objection. **See** Pa.R.E. 801.

Appellant's challenge to Nathan's records as the "best evidence" also fails. Contrary to Appellant's argument, the defense did not attempt to prove the content of the record. Rather, the contents of the documents were "merely evidence of, rather than material to, issues in the case," namely whether the decedent reported pain. *Hamill-Quinlan, Inc. v. Fisher*, 591 A.2d 309, 313 (Pa. Super. 1991) (citation omitted); *see also* Pa.R.E. 1002 & cmt., 1004(d). Further, we discern no basis to conclude that the best evidence rule applied to preclude Nathan's record where two original writings existed memorializing the data from the visits. Therefore, we agree with the trial court that Appellant failed to establish a violation of the best evidence rule.

### Conclusion

For these reasons, we conclude that Appellant's challenges to the trial court's evidentiary rulings concerning the standard of care are waived and lack merit. We also affirm the trial court's rulings admitting the data entry templates presented Pediatric Alliance as exhibits and overruling Appellant's best evidence objections to Nathan's medical records. Accordingly, we affirm the judgment entered in favor of Appellees.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/17/2021

- 41 -