J-A15037-22

## NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37

| | | |
|---|---|---|
| JOHN R. RODGERS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHELE M. JEWETT | : | |
| | : | |
| Appellant | : | No. 1428 WDA 2021 |

Appeal from the Order Entered November 22, 2021
In the Court of Common Pleas of Mercer County Civil Division at No(s):
2021-2543

BEFORE: BOWES, J., KUNSELMAN, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.: **FILED: July 20, 2023**

Michele M. Jewett appeals from the order granting a final protection from abuse ("PFA") order to John R. Rodgers ("Appellee"). We affirm.

We provide the following background. Appellee and Appellant engaged in a sexual relationship, while Appellee was married, lasting from October of 2020 to March of 2021. During the affair, Appellant informed Appellee that she had been criminally charged after her ex-husband accused her of pointing a loaded gun at him.[1] **See** N.T. Hearing, 11/22/21, at 18-19.

---

[1] We note that while the trial court rejected the attempted testimony on this topic from Appellee's wife, the court allowed Appellant's testimony regarding the incident with her ex-husband. **See** N.T. Hearing, 11/22/21, at 18-19, 40-41, 127-28. Specifically, Appellant testified that she told Appellee about the original charges and underlying incident but that she had never pointed a gun at her ex-husband or anyone else, and she stated that she never disclosed to Appellee the ultimate disposition of the charges. **See id**. at 19. Appellant explained to the court that she pled guilty to summary harassment and
*(Footnote Continued Next Page)*

In the beginning of March 2021, the affair ended after a "heated exchange" about the status of their relationship. *Id*. at 59. Angry with Appellee for not leaving his wife, Appellant texted him that she planned "to get back at [him]" by telling his wife and sending her "the information that she had" if he did not "fess up to [his wife] and take [his] beating." *Id*. at 59-60, 74. Appellee responded by blocking Appellant's phone number. *Id*. at 60.

On March 14 and 15, 2021, Appellee's wife received approximately thirty email messages at her work email address from "Amanda Gill," a presumed alias, using the address "germantown979@yahoo.com." *Id*. at 24-26, 69-70. The email messages informed Appellee's wife of the affair, referenced specific conversations between Appellant and Appellee regarding certain incidents with Appellee's wife during the affair, and attached screenshots of text messages between Appellee and Appellant from October 2020 to March 2021. *Id*. Appellee's wife blocked the "germantown979" email address. *Id*. at 29.

On March 15, 2021, Appellee's wife forwarded the emails to Appellee, who admitted to the affair and opined that the sender was in fact Appellant due to the attachments and the verbiage used in the email messages. *Id*. at

_____

disorderly conduct for "calling my [ex-]husband a bad word." *Id*. In its opinion, the trial court concluded that Appellant's testimony was properly admitted and relied upon it in its analysis, finding that her telling Appellee about the prior incident was relevant to the reasonableness of Appellee's fear. *See* Trial Court Opinion, 1/26/22, at 8.

39, 65, 68-69, 72-73. Appellee reached out to Appellant and asked her to stop contacting his wife. *Id*. at 89.

From April to July of 2021, Appellant did not attempt to contact Appellee or his wife. *Id*. at 80. However, on August 31, 2021, Appellee received a text message from Appellant, using an unknown phone number ending in -3308, asking him "how [his] divorce was going." *Id*. at 54. Appellee responded that he knew the message was from Appellant. *Id*. The following day, Appellee's wife also received a text message from the -3308 phone number. *Id*. at 27-28.

On September 15, 2021, Appellee's wife received an additional thirty-four email messages from "Amanda Gill," again referencing Appellee's affair with Appellant and attaching screenshots of text messages between Appellee and Appellant. *Id*. at 29, 65-66, 68, 70. The emails were sent from the address "germantown999@yahoo.com," but had been forwarded to that email address from the "germantown979" email address that Wife had blocked in March. *Id*. at 29.

Wife received another text message from the -3308 number on September 16, and an additional email, of the same type, on September 21, 2021. *Id*. Again, Appellee's wife forwarded the communications to Appellee. *Id*. Once again, the messages contained content that led Appellee to believe Appellant had sent them. *Id*. at 29, 87-88. Appellee also received a second text message from Appellant at the -3308 number, threatening to contact

insurance companies Appellee worked with, indicating that she did not feel Appellee was "suffering" since he was not "getting [his] beating." *Id*. at 93.

Also around this time, Appellant posted as her Facebook banner a picture taken from her security camera that depicted Appellee and Appellant embracing inside her home, with Appellant's face blurred. *Id*. at 64-65, 89-90, 124. Appellant then sent Facebook friend requests to Appellee's sister, sister-in-law, daughter, ex-wife, and mother. *Id*. at 85, 93. Additionally, Appellant sent an email to Appellee's sister, informing her "about the state of [Appellee's] marriage." *Id*. at 100. Several of Appellee's family members saw Appellee in Appellant's Facebook banner picture and immediately contacted Appellee. *Id*. at 93, 100.

Finally, in early October 2021, Appellant confronted Appellee's daughter outside a bathroom stall in the restaurant where his daughter worked. The restaurant was approximately seventy-five miles away from where Appellant resided. Appellant did not introduce herself, but quickly informed Appellee's daughter that Appellee had engaged in an affair with Appellant, and then immediately left the restaurant. Confused by this interaction, Appellee's daughter informed him about what had transpired. *Id*. at 93, 103.

Even though Appellant had made no direct physical threats, Appellant's escalation from sending messages to his family members to appearing in-person at his daughter's workplace made Appellee fear for his safety. *Id*. at 80. Appellee worried that once Appellant realized she had not succeeded in ending his marriage, the next confrontation would escalate to a physical

assault. Therefore, Appellee petitioned the court for a PFA order. The court granted a temporary PFA and scheduled a final PFA hearing. *Id*. at 94.

Meanwhile, Appellee and his wife also contacted the Pennsylvania State Police, who decided to pursue harassment and stalking charges against Appellant. Despite awareness of the temporary PFA order and pending criminal charges, Appellant did not remove the Facebook banner picture and continued attempting to contact Appellee through third parties. *Id*. at 129-31 (Appellant admitting that she sent a friend request to a friend of Appellee's wife less than one week before the final PFA hearing). Appellant also unsuccessfully petitioned for a PFA order against Appellee, alleging that Appellee had drugged and sexually abused her multiple times during their relationship and once aggressively pursued her in a vehicle. *Id*. at 78-79.

On November 22, 2021, the trial court held a final PFA hearing. After receiving testimony from Appellee, Appellee's wife, Appellee's daughter, Appellee's sister, and Appellant, the trial court found Appellant's testimony incredible. Specifically, the court did not believe Appellant's claims that "Amanda Gill" was a separate entity, that Appellant did not realize the people she was friend-requesting were Appellee's relatives and friends, that she was entitled to post the picture of Appellee because he had no reasonable expectation of privacy while inside her home, and that she coincidentally encountered Appellee's daughter during a day trip with her son. *Id*. at 140. Instead, the court credited Appellee's testimony that Appellant's increasingly erratic behavior had been undeterred by the entrance of the temporary PFA

order and that Appellee was, therefore, in reasonable fear of bodily injury. *Id*. Based upon the above facts and recognizing that a PFA order may be entered where the victim reasonably fears bodily injury, the trial court entered a final PFA order prohibiting Appellant from having any direct or indirect contact with Appellee. *Id*.

Thereafter, Appellant timely appealed,[2] challenging the order granting Appellee's petition for a final PFA order.[3] Both Appellant and the trial court complied with Pa.R.A.P. 1925. On appeal, Appellant raises the following issues for our consideration:

1. Did the court err by deeming [Appellee] credible?

2. Did the court err/abuse its discretion by entering a final [PFA] order when the alleged actions did not meet the definition of "abuse" under the statute?

3. Did the court err/abuse its discretion by failing to apply an objective standard of reasonableness as it relates to [Appellee's] alleged fear of [Appellant]?

4. Did the court err by considering actions allegedly taken by [Appellant] against individuals who do not meet the required

---

[2] Appellant simultaneously filed a motion for reconsideration. The court initially denied the motion for reconsideration while granting leave for the parties to file briefs in support of a *de novo* hearing, but subsequently vacated that order upon realizing that Appellant had appealed to this Court. Appellant filed another motion to reconsider, asserting that by permitting briefing the court had granted the initial reconsideration motion and had jurisdiction to schedule a *de novo* hearing notwithstanding the pending appeal. The trial court did not rule on this second motion and the matter proceeded to this Court.

[3] We separately address Appellant's appeal from the order denying her PFA petition against Appellee at ***Jewett v. Rodgers***, No. 1429 WDA 2021.

relationship under the [PFA] Act in making a finding of abuse?

5. Did the court err by unfairly shifting the burden of proof to [Appellant] in this matter?

6. Did the court err/abuse its discretion by using the entry of a final [PFA] order in this matter as punishment [for Appellant's] refusal to provide information to [Appellee] to assist in his criminal case against her?

7. Did the court err/abuse its discretion by admitting unauthenticated text message and email evidence?

8. Did the court err by admitting irrelevant testimony regarding [Appellee's] phone records?

9. Did the court err/abuse its discretion by admitting testimony regarding text messages that [Appellee] was not able to produce?

10. Did the court err by admitting hearsay evidence related to information regarding [Appellant's] alleged prior criminal charges?

11. Did the court err by allowing witnesses to testify via video during the proceedings?

Appellant's brief at 9-11 (cleaned up, reordered for ease of disposition).

Appellant's first four claims implicate the sufficiency of the evidence to enter the final PFA order. "In reviewing the validity of a PFA order, we must determine whether the evidence, in the light most favorable to petitioner and granting [him] the benefit of all reasonable inferences, was sufficient to sustain the trial court's determination that abuse was shown by the preponderance of the evidence." *S.W. v. S.F.*, 196 A.3d 224, 228 (Pa.Super. 2018) (citation omitted). This Court "review[s] the trial court's legal conclusions for an error of law or abuse of discretion." *Hood-O'Harra v.*

*Wills*, 873 A.2d 757, 759 (Pa.Super. 2005) (cleaned up). Assessing the "[c]redibility of witnesses and the weight accorded their testimony is within the exclusive province of the [trial court] as fact finder." *Mescanti v. Mescanti*, 956 A.2d 1017, 1020 (Pa.Super. 2008) (citation omitted). Thus, we defer to the trial court's determination of the credibility of witnesses at the hearing where they are supported by the record. *See Fonner v. Fonner*, 731 A.2d 160, 161 (Pa.Super. 1999) ("This court defers to the credibility determinations of the trial court as to witnesses who appeared before it." (cleaned up)). Indeed, "this Court has no authority to overturn the trial court's credibility determinations in [PFA] matter[s]." *Karch v. Karch*, 885 A.2d 535, 537 (Pa.Super. 2005) (cleaned up) (citing *Fonner*, *supra*).

Appellant alleges that the evidence presented failed to establish "abuse" under the PFA Act and the court erred in finding Appellee credible. *See* Appellant's brief at 34. According to Appellant, while her communication may have been unwanted or impolite, "mere annoyance or unwanted communication cannot form the basis of a finding of abuse." Appellant's brief at 33 (citing *D.H. v. B.O.*, 734 A.2d 409 (Pa.Super. 1999)). Moreover, she argues that the court failed to apply an objective standard in assessing the reasonableness of Appellee's alleged fear because "the actions that can be tied to the Appellant would not reasonably lead to fear of imminent bodily harm." *Id*. at 43. Finally, she contends that the court erred by basing its finding of abuse against Appellee on testimony from other individuals, and in concluding that Appellee was credible. *Id*. at 34-37, 47-48.

The PFA Act defines "abuse," in relevant part, as follows:

The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

. . . .

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury.

23 Pa.C.S. § 6102(a).

We agree with Appellant that the certified record evinces no past physical violence by Appellant to Appellee or explicit threats of future bodily injury. However, the "purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of **advance** prevention of physical and sexual abuse." *Custer v. Cochran*, 933 A.2d 1050, 1054 (Pa.Super. 2007) (cleaned up, emphasis added). Thus, the PFA Act does not require actual physical harm before issuing a PFA order. *See E.K. v. J.R.A.*, 237 A.3d 509, 522 (Pa.Super. 2020) (noting that "[b]ecause the goal of the PFA Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the PFA Act to apply"). Since there is a multitude of ways to convey a threat of physical harm, a showing of "'reasonable fear' is sufficient." *S.W.*, *supra* at 231 (quoting 23 Pa.C.S. § 6102).

Appellant contends that the threats set forth in *D.H.*, *supra*, far exceed any alleged threats that she made. *See* Appellant's brief at 32. Upon review, we do not find *D.H.* analogous to the instant case. In *D.H.*, this Court reversed the grant of a final PFA order after finding that the defendant's threats to expose potentially damaging financial information did not place the plaintiff in reasonable fear of bodily injury. Therein, the plaintiff received five days of harassing messages. Here, on the other hand, Appellant made escalating threats to Appellee over several months. When direct contact failed to cause Appellee to suffer enough for her satisfaction, Appellant expanded her reach to include various friends and family members of Appellee, even confronting Appellee's daughter in person. Accordingly, the extensive scope and duration of Appellant's course of conduct in this case sets it apart from that we considered in *D.H.*

Instead, we find *E.K.*, *supra*, more fitting. In *E.K.*, the petitioner sought a PFA order after the defendant made a social media post about her. The defendant's post referred to the petitioner as a "conniving bitch[,]" stated that she had "destroyed everything [he] care[d] about[,]" and warned that "one day" everything she had "done to [him] will be returned to [her] tenfold[.]" *Id*. at 515. Although the defendant made no explicit threat in the post, the court credited the petitioner's testimony that she construed the post "as a threat to harm her physically," and feared imminent serious bodily injury from the defendant as he had harmed her in the past. *Id*. at 515. Drawing

- 10 -

inferences in the petitioner's favor, the trial court also concluded that the defendant likely knew the post was threatening and intended for it to be viewed by petitioner. Accordingly, the trial court granted the PFA petition, pursuant to § 6102(a)(2), which requires a petitioner to demonstrate a reasonable fear of imminent serious bodily injury. The defendant appealed, alleging that the petitioner had "failed to demonstrate that she had a reasonable fear of imminent serious bodily injury[.]" *Id*. at 521. This Court affirmed the final PFA order, accepting the trial court's credibility determination that the petitioner interpreted the post as a threat to her physical safety and that her fear was objectively reasonable. *Id*.

Here, unlike in *E.K.*, it is undisputed that Appellant never physically assaulted Appellee in the past. However, Appellant, by her own testimony, informed Appellee of a prior incident wherein she allegedly pointed a loaded gun at her ex-husband's head during a disagreement. *See* N.T. Hearing, 11/22/21, at 18-19. Additionally, Appellant's threats that she was "going to get back at [him]," that Appellee was not "suffering" and needed "to take [his] beating" were similar to the phrases used in the *E.K.* social media post. *Id*. at 59, 74, 93. Moreover, Appellant's escalating behavior supports the court's finding that, based upon his knowledge of Appellant, Appellee had a reasonable belief that Appellant's next step could be the infliction of physical harm upon him. *See* N.T. Hearing, 11/22/21, at 80 (Appellee testifying, "She's reaching out to my family and friends. She . . . has driven out of the

way to confront my daughter. These are things that have all escalated since the dumping of [emails in] September. I truly do believe that she's capable of doing more than this, and I don't want to not be ready.").

The trial court was permitted to credit this testimony as "lending . . . to the fear and reasonableness of that fear experienced by Appellee." Trial Court Opinion, 1/26/22, at 8; **see also E.K.**, **supra** at 522. As the credibility determination is supported by the record, we reject Appellant's invitation to reassess Appellee's credibility. **See Karch**, **supra** (holding that this Court cannot overturn a court's credibility determinations in a PFA matter).

We also reject Appellant's claim that the trial court should not have considered testimony from Appellee's family with respect to the fear that Appellee felt. Appellee testified that each family member relayed the details of their interaction with Appellant to him directly. **See** N.T., 11/22/21, at 93, 100. Accordingly, the trial court properly factored their testimony into its assessment of the reasonableness of Appellee's fear. The people targeted, the subject matter of their conversations, and Appellant's stated goal of disrupting Appellee's marriage lends credence to the trial court's consideration of these events as successful attempts at intimidating Appellee through third parties. **See E.K.**, **supra** at 513-20 (affirming the trial court's finding that, by posting his threats on Facebook, the defendant intended for the post to be seen by petitioner and for her to be intimidated by it). Accordingly, these

interactions are highly probative evidence as to the effect Appellant's actions had on Appellee.

Viewing the evidence in the light most favorable to Appellee supports the trial court's conclusion that an ordinary person in Appellee's position, having sustained six months of verbal acts of intimidation that had recently escalated to in-person contact, would fear a physical assault was on the horizon. **See S.W.**, **supra** at 228. Thus, we discern no error or abuse of discretion in the trial court's application of the standard for assessing the reasonableness of Appellee's fear of bodily injury, nor in its finding that Appellee established abuse pursuant to § 6102(a)(5) by a preponderance of the evidence. **See** Trial Court Opinion, 1/26/22, at 2 ("The tactics, the nature of the attacks, and the vectors of escalation combined with the disregard for proper conduct in light of a temporary [PFA] levied against Appellant would put a reasonable person in fear of serious bodily injury at the hand of Appellant and/or Appellant's agents." (cleaned up)). Accordingly, the trial court did not err in granting Appellee's request for a final PFA order.

Next, Appellant alleges that the trial court improperly shifted the burden of proof to Appellant at the PFA hearing. **See** Appellant's brief at 37. The burden of proof in PFA cases is the preponderance of the evidence, which "is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly[.]" **Raker v. Raker**, 847 A.2d 720, 724 (Pa.Super. 2004) (citation omitted).

In its Rule 1925(a) opinion, the trial court accurately noted that it placed the burden of proof on the respective petitioners in their petitions against one another. *See* Trial Court Opinion, 1/26/22, at 13. On appeal, Appellant clarified that this claim was not based on the assignment of burdens of proof, generally, but on the court inquiring about her reasons for traveling to the restaurant where Appellee's daughter worked and why she did not call "Amanda Gill" as a witness at the PFA hearing. *See* Appellant's brief at 38. Critically, Appellant did not object to the court's questions at the hearing and did not raise this claim of error with sufficient particularity in her Rule 1925(b) statement for the court to be on notice to address it. Accordingly, it is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Even if not waived, our review of the certified record supports the court's finding that it applied the correct burden of proof. The court found Appellee credible and that he had met his burden, and that Appellant's proffered evidence did not cast doubt on Appellee's evidence or otherwise convince the court that it should not enter the final PFA order. *See Karch*, *supra* at 538 (determining that, upon review of the court's statement that defendant did not provide evidence to tip the scale in his favor in context, the court applied the correct burden of proof and "it [wa]s apparent that the trial court found that [plaintiff] met her burden under the PFA Act and that [defendant's] testimony did not cast doubt on [plaintiff's] evidence or persuade the trial

court that the petition should be dismissed"). Therefore, Appellant is not entitled to relief on this claim.

Appellant next argues that the trial court abused its discretion by entering the final PFA order as punishment for Appellant's refusal to provide contact information for "Amanda Gill" that could have been used in the pending criminal case against Appellant based upon her harassment of Appellee's wife. *See* Appellant's brief at 49. The trial court found this claim of error "wholly unfounded." Trial Court Opinion, 1/26/22, at 12. Upon review of the certified record, we agree that there is nothing to lend any credence to Appellant's claim that the instant PFA order was entered by the trial court as retribution for Appellant's refusal to provide information regarding "Amanda Gill" for use in the pending criminal matter.

Prior to the final PFA hearing, Appellant invoked her Fifth Amendment right against self-incrimination and asked for a continuance based upon the pending criminal case, which was scheduled for a preliminary hearing in early November 2021. The court granted that request and continued the hearing to November 22, 2021. At the continued hearing, the parties neglected to apprise the court of the status of the criminal charges. Indeed, it was not until Appellant finished her direct testimony regarding her PFA petition against Appellee, wherein she mentioned not meeting Appellee's wife until "that preliminary hearing a few weeks ago" that the court learned the criminal charges were still pending. *See* N.T. Hearing, 11/22/21, at 8. The court

immediately advised Appellant of her right to remain silent. *See id*. at 20-21 ("I wish I would have known that before she testified so I could give her her [F]ifth [A]mendment warnings. . . . I was not aware that there are criminal charges as a result, and we would have had a warning before you testified, but you have counsel. So based on that, before you get re-called, you have an absolute right to remain silent; okay?").

When Appellee's counsel sought to re-call Appellant for cross-examination, the court reminded Appellant of her right to remain silent. *See id*. at 112 ("I would once again advise her that I would not recommend [being re-called by Appellee's counsel] based on the fact that she's facing criminal charges and has an absolute right to remain silent."). When Appellant indicated that she would take the stand again because she was telling the truth, the court again advised her of the repercussions of that decision. *See id*. at 114 ("Ma'am, I want you to understand, and you have counsel if you need a minute to talk to counsel. It is very unusual for somebody facing criminal charges to go through a PFA hearing based on the fact they have a fifth amendment right to remain silent. . . . And anything you say now, the district attorney's office can use against you at a potential trial you have.").

Ultimately, after speaking with counsel, Appellant waived her right to invoke the Fifth Amendment. *See id*. (after the court noted "you've been explained that you have an absolute right to remain silent. Are you agreeing

to waive that to testify[,]"Appellant answered "Correct. Yeah"). Based on the foregoing, we deem this claim wholly devoid of merit.

Appellant's remaining challenges concern the court's admission of various pieces of evidence. "Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and may be reversed on appeal only when a clear abuse of discretion was present." ***Buchhalter v. Buchhalter***, 959 A.2d 1260, 1263 (Pa.Super. 2008) (cleaned up). Specifically, Appellant assails the admission of emails sent by "Amanda Gill" to Appellee's wife, and the admission of text messages sent to Appellee and Appellee's wife from the -3308 phone number, based upon Appellee's failure to authenticate the communications. ***See*** Appellant's brief at 20-25.

This Court has explained the requirements of authentication as follows:

Pennsylvania Rule of Evidence 901 requires authentication prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. Pa.R.E. 901(b)(1). Evidence that cannot be authenticated by a knowledgeable person, pursuant to [§] (b)(1), may be authenticated by other parts of [§] (b), including circumstantial evidence pursuant to [§] (b)(4). Pa.R.E. 901(b)(4) (item's appearance, contents, substance, internal patterns, or other distinctive characteristics, taken together with all the circumstances).

***Commonwealth v. Orr***, 255 A.3d 589, 595 (Pa.Super. 2021).

Appellant does not challenge the accuracy of the messages, but rather challenges the conclusion that she sent them. Preliminarily, we observe that Appellant did not object to the admission of Exhibit 8, which contained the

September 2021 emails and attachments. *See* N.T. Hearing, 11/22/21, at 66. Accordingly, Appellant has waived her challenge to the admission of the September emails. *See* Pa.R.A.P. 302(a).

Turning to the March 2021 emails and text messages from the -3308 phone number, Appellee sought to authenticate these communications as coming from Appellant through circumstantial evidence. *See* N.T. Hearing, 11/22/21, at 26, 31, 55-56. To wit, the proffered circumstantial evidence included that all the communications at issue concerned Appellee's romance with Appellant. The March 2021 emails were sent to Appellee's wife shortly after the dalliance concluded ostensibly due to Appellee's refusal to leave his wife. *See* N.T. Hearing, 11/22/21, at 24-25. Indeed, the emails followed Appellant's explicit threat to Appellee "to tell" his wife about the affair "and send her the information that she had." *Id*. at 59-60. True to her word, the March 2021 emails disclosed Appellee's extramarital relationship with Appellant, referenced specific conversations during the fling between Appellee and Appellant regarding Appellee's wife, and included attachments of screenshots of text messages between Appellant and Appellee during the romantic entanglement. The uncontested September 2021 emails also included screenshots of text messages between Appellee and Appellant and originated from the same "germantown979" email address. *Id*. at 29, 60, 65, 68, 70. Both Appellee and his wife received text messages from the -3308 phone number in September 2021, with Appellee's wife receiving a text

message about her marriage before the September email dump, and Appellee receiving a message asking about his divorce mere days after the email dump.

Upon review of the certified record, we conclude that the voluminous circumstantial evidence established that Appellee authored the March 2021 emails and the text messages from the -3308 phone number.[4]  Accordingly, the trial court did not abuse its discretion in finding that the authentication of these communications had been established and admitting them into evidence.[5]

Appellant next argues that the trial court erred in admitting Appellee's phone records based upon the argument that because Appellee failed to link Appellant to the phone number that sent text messages to Appellee and his wife, the records were irrelevant.  **See** Appellant's brief at 46-47.  "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact."  **Smith v. Morrison**, 47 A.3d 131, 137 (Pa.Super. 2012) (cleaned up).  A trial court considering a PFA petition has wide discretion in hearing evidence and determining its relevance

---

[4] Indeed, the trial court doubted the existence of "Amanda Gill" given Appellant's evasive answers.  **See** Trial Court Opinion, 1/26/22, at 7 n.12.

[5] In response to Appellant's Rule 1925(b) concise statement, the trial court addressed the best evidence rule.  **See** Trial Court Opinion, 1/26/22, at 5. However, this Court may "affirm the trial court's decision . . . on any basis that is supported by the record."  **Clark v. Peugh**, 257 A.3d 1260, 1271 n.8 (Pa.Super. 2021) (citation omitted).

- 19 -

throughout the course of the proceedings. In that regard, we have held as follows concerning the admission of remote instances of abusive conduct:

> In light of the protective purposes of the act, it was within the trial court's discretion to hear any relevant evidence that would assist it in its obligation to assess the appellee's entitlement to and need for a [PFA] order. If the trial court found the testimony to involve events too distant in time to possess great relevance to the case, it could certainly have assigned less weight to the testimony. However, it was not an abuse of discretion for the trial court to hear the evidence.

*Miller on Behalf of Walker v. Walker*, 665 A.2d 1252, 1259 (Pa.Super. 1995).

As discussed *supra*, Appellee presented sufficient circumstantial evidence to establish Appellant's authorship of the text messages from phone number -3308. The phone records corroborated Appellee's testimony regarding the dates of when he received the text messages and the trial court found the records relevant to the reasonableness of Appellee's fear. *See* Trial Court Opinion, 1/26/22, at 6-7. Upon review of the certified record, we discern no abuse of discretion. Accordingly, Appellant is not entitled to relief on this claim.

Appellant's next evidentiary challenge concerns the court's decision to permit Appellee's testimony about text messages he received but did not produce.[6] *See* Appellant's brief at 26-28. We review this claim mindful of the

_____

[6] We note that Appellant's reference to an objection on page forty-seven of the hearing transcript did not pertain to this issue. *See* Appellant's brief at
*(Footnote Continued Next Page)*

following principles. The best evidence rule provides that "an original writing is required in order to prove its content." ***Commonwealth v. Talley***, 265 A.3d 485, 531 (Pa. 2021) (cleaned up) (citing Pa.R.E. 1002). "[W]hen the content of a writing is closely related to a controlling issue, the party seeking to prove that issue must offer either the original or a duplicate." ***Id***. "Where the document cannot be produced because it is lost or destroyed, production of the original is excused and other evidence becomes admissible. Application of the rule is limited to those situations where the contents of the document are at issue and must be proved to make a case or provide a defense." ***Hera v. McCormick***, 625 A.2d 682, 687 (Pa.Super. 1993) (cleaned up).

By way of background, Appellee introduced his phone records in part to show that he received multiple text messages from the -3308 phone number on August 31 and September 18, 2021. Appellee had deleted the messages relating to this exchange. Appellee testified that "if my memory serves me right," the September text message asked "how [his] divorce was going." N.T. Hearing, 11/22/21, at 54. Counsel then asked about Appellee's response to the text and, as he attempted to remember how many responses he sent, Appellant objected to his testimony about the content of the messages without

---

26. Rather, it concerned an objection to the admission of the phone records without proper authentication. ***See*** N.T. Hearing, 11/22/21, at 46-48. However, because the certified record bears out that Appellant also objected to Appellee's testimony concerning the text messages that he did not produce, that claim is preserved for our review.

producing them based on hearsay grounds. *Id*. at 55. The court overruled the objection. *Id*. at 57. Thereafter, Appellee testified to a text message he received from the -3308 number on September 18, 2021, and produced a screenshot of the message. *Id*. at 58-59. Appellant did not object.

In light of the foregoing, Appellant's claim really only implicates Appellee's testimony regarding a single text message he received from the -3308 phone number asking how his divorce was going. According to the trial court, if a text message was admitted without Appellant's stipulation, the court considered it not for the truth of the contents of the message, but for the effect on Appellee and the reasonableness of his fear. *See* Trial Court Opinion, 1/26/22, at 5-6. Certainly, the contents of the text message were relevant to the reasonableness of Appellee's fear. However, even assuming that the contents were therefore necessary for Appellee to meet his burden, he was permitted to testify to the contents because the document could not be produced. *See Hera*, *supra* at 687. Moreover, given the abundant evidence presented in this case, the admission of testimony regarding this single text message "did not affect the verdict and was therefore harmless." *Yacoub v. Lehigh Valley Med. Assocs., P.C.*, 805 A.2d 579, 590 (Pa.Super. 2002) (*en banc*) (cleaned up).

Appellant next argues that the trial court erred in admitting hearsay testimony from Appellee's wife that she had learned about Appellant's prior criminal charges related to the incident with Appellant's ex-husband. *See*

Appellant's brief at 43-45. Appellant acknowledges that the court properly rejected this testimony at the hearing, but claims that the court subsequently relied on the knowledge of the criminal charges by Appellee's wife in assessing Appellee's fear in its Rule 1925(a) opinion. Appellant's claim is belied by the record.

At the hearing, in response to the court's question of what she found threatening in the texts and emails, Appellee's wife testified as follows:

> I believe that sending someone the amount of e-mails in the amount of time that she did is not normal behavior. I also, after my husband told me who the person was, I Google searched her and found out that . . . she pointed a loaded gun at her ex-husband and was arrested for terroristic threats and aggravated assault.

N.T. Hearing, 11/22/2021, at 40. Appellant's counsel objected. While the court did not explicitly sustain the objection, it nonetheless advised Appellee's wife that the answer was non-responsive and redirected her to the specific question asked, thereby effectively sustaining the objection. *Id*. at 41. More to the point, in its opinion, the court stated that it did not consider the statement made by Appellee's wife relating to the prior charges but did consider Appellee's knowledge of the incident not for the truth of the matter asserted, *i.e.*, that Appellant previously pointed a loaded gun at her ex-husband, but for the effect that had on Appellee in assessing the reasonableness of Appellee's fear. *See* Trial Court Opinion, 1/26/22, at 8. As noted *supra*, Appellant herself specifically testified that she told Appellee about the original charges. Thus, she cannot now claim that the trial court erred in

considering the impact of that knowledge on the reasonableness of Appellee's fear. Regardless, based on the foregoing, it is apparent that the testimony from Appellee's wife regarding the prior incident was not considered by the court following Appellant's objection. Therefore, no relief is due on this claim.

Finally, Appellant argues that the trial court erred by allowing Appellee's witnesses to testify by video. *See* Appellant's brief at 45-46. According to Appellant, she "was extremely concerned about the ability of witnesses testifying by video to be coached or review notes regarding their testimony." *Id*. at 45. Since Appellee's wife initially had notes when she took the stand and one video witness attempted to use notes, Appellant averred that "it is reasonable to conclude that the other witnesses in this matter who were permitted to testify by video had access to notes during their testimony or had been otherwise coached." *Id*. at 45-46.

By way of background, three witnesses testified by video at the hearing: Appellee's sister, Appellee's daughter, and Appellee's sister-in-law. Prior to the hearing, Appellee asked the court's permission for these witnesses to appear by alternative means. Appellant avers in her brief that she "served a response to this request asking that the same be denied." *Id*. at 45. However, no such objection appears in the certified record. Moreover, the court's order granting the motion contains no reference to any such objection.

Nonetheless, at the hearing, Appellant purported to renew her general objection to any witness being permitted to testify by video. *Id*. at 2. In

response, the court noted that it preferred not to use video testimony and if there were "problems, then either party can move for a continuance until we can get them here live and in person, and if they can't show up, then obviously they can't testify." *Id*. at 5. Appellant's counsel stated that she understood the court's position. *Id*. In terms of a specific objection, counsel stated that "I just – I have a demonstrative as it relates to [Appellee's] daughter . . . which she may or may not be able to interact because she's via video[.]" *Id*. The court agreed to revisit the objection if there were any issues with the demonstrative exhibit. *Id*.

Appellant did not request a continuance for the individuals to appear in person. Critically, it was not until the testimony of Appellee's sister who, when answering a question about when she received an email from "Amanda Gill" appeared to be using notes, that counsel objected and observed offhand that "reviewing notes" was "part of the reason why I was concerned about the witnesses testifying via video." *Id*. at 100. The objection was sustained and Appellee's sister was reminded not to use notes. *Id*. Next, Appellee's daughter testified by video without incident and without objection concerning the possibility of note-reviewing. *See id*. at 103-08. Finally, Appellee's sister-in-law testified, but the trial court discontinued her testimony due to poor audio and video quality. *See id*. at 111-12. As to Appellant's complaint about Appellee's wife having notes during her testimony, the court advised her before she took the stand that she could have the notes with her but could

- 25 -

not look at them unless directed to do so. *Id*. at 23. There is no indication in the record that Appellee's wife disregarded those instructions.

Based on the foregoing, it does not appear that Appellant lodged a timely and specific objection to the witnesses being allowed to testify by video based upon their access to notes or potential to be coached. It is axiomatic that in order to preserve an issue for appeal, an appellant must make a timely and specific objection on the record. *See Hassel v. Franzi*, 207 A.3d 939, 951 (Pa.Super. 2019). Failure to do so will result in waiver. *See id*. Based on the foregoing, Appellant has waived this claim. Even if not waived, we discern no abuse of discretion on the trial court's part in permitting the witnesses to testify by video.

In sum, Appellant has not presented any issues to this Court that warrant relief. Accordingly, we affirm the final PFA order entered against Appellant.

Order affirmed.

Judge Kunselman joins this Memorandum.

Judge Sullivan files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/20/2023</u>